STATE OF NEBRASKA, APPELLEE, V. RONALD L. MORLEY,
APPELLANT.
STATE OF NEBRASKA, APPELLEE, V. WILLIAM A. MORLEY,
APPELLANT.
474 N.W.2d 660

Filed September 20, 1991.   Nos. 90-689, 90-702.

Dalton W. Tietjen, of Tietjen, Simon & Boyle, for appellants.

Don Stenberg, Attorney General, and Donald A. Kohtz for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

CAPORALE, J.

## I. INTRODUCTION

In case No. 90-689, the defendant-appellant Ronald L. Morley was charged with attempted burglary, in violation of Neb. Rev. Stat. §§ 28-201 and 28-507 (Reissue 1989). His brother, defendant-appellant William A. Morley, was charged with the same crime in case No. 90-702. In accordance with the verdicts delivered following a consolidated trial, the district court adjudged each of the brothers guilty as charged and sentenced each to a 6-month term of imprisonment in the county jail. In these separate but consolidated appeals, the brothers assign errors which combine to assert that (1) the

district court erred in overruling their motions to dismiss at the conclusion of the State's evidence, (2) the evidence was insufficient to support the verdicts and judgments entered thereon, (3) they received ineffective assistance of trial counsel, (4) the jury was improperly charged, and (5) the sentences imposed were excessive. We affirm.

## II. FACTS

At approximately 2:30 a.m. on November 5, 1989, Officer Patrick Knopik of the Lincoln Police Department discovered the brothers in an alley behind an automobile-appearance-enhancing shop located in a Lincoln strip mall shopping center containing a number of facilities. The shop was located at the west end of the mall in a single-story multitenant building. A contiguous lot provided parking space for the shopping center.

The shop has two rear doors: a typical metal entry door with a locking doorknob located approximately 9 inches below a separate dead bolt lock, and an overhead garage-type door. The overhead door appears to be located about 3 feet east of the entry door and immediately west of a garbage Dumpster.

Knopik observed a person, who was wearing gloves and carrying an object in his right hand, walk in an easterly direction in front of his cruiser. The person bent over and placed the object next to the shop building behind the aforementioned Dumpster and then resumed walking easterly, away from Knopik, taking two or three steps before stopping and turning around near the center of the alley as Knopik stopped his cruiser. Knopik also saw a second person standing near the two doors at the rear of the shop.

Knopik got out of his cruiser and sought identification from the first person, William. Ronald proved to be the other person. At that time, neither brother offered an explanation for his presence.

Knopik placed both brothers onto the back seat of his cruiser, called for assistance, and inspected the area behind the Dumpster where he had seen William placing the object he had carried in his right hand. Knopik found a pry bar approximately 12 to 14 inches long with one flattened end. This

was the only object found near the Dumpster.

Knopik then returned to his cruiser and questioned the brothers, who claimed to be parking lot paint stripers looking for business. William told Knopik that their automobile was in the parking lot of an adjacent apartment complex, but it was not visible from Knopik's position. By this time, Officer James Foral of the Lincoln Police Department had arrived at the scene. The brothers were then separated, William being placed in Foral's cruiser and Ronald remaining in Knopik's.

The rear entry door to the shop appeared to have been tampered with. The State theorized that the flat end of the pry bar had been inserted into the space between the door and the jamb and the bar then pried against the door while force was simultaneously applied to the doorknob in an effort to increase the size of the gap between the door and the jamb such that the door would swing free.

The doorknob, although locked, was drooping and quite loose. The door was dented in the area between the knob and the dead bolt, which was not in a locked position. The metal doorjamb, in the area horizontal to the dents on the door, was scratched and scraped such that metal was freshly exposed and paint fragments protruded from the scraped surface. Several witnesses testified that the dents on the door and the marks on the jamb were consistent with markings observed on other doors that had been forcibly pried open.

The owner of the shop, who was called to the scene by the police between 2:40 and 3 a.m. on November 5, 1989, testified that he had worked late on November 4 and that although he had locked the rear entry door, he had forgotten to engage the dead bolt lock. He noticed that the doorknob on the entry door was looser to the touch than normal and drooping more than when he had left the shop the previous evening. He further testified that he had not previously noticed the dents in the entry door around the knob, which dents appeared new to him. In addition, the owner stated that the recovered pry bar was not his and that he had not noticed it in the area around the Dumpster the previous evening.

No useful fingerprints were found either near the entry door or on the pry bar itself. The State's trace evidence expert

conducted laboratory examinations of exterior paint scraped from the area around the doorknob and a paint chip found in the previously clean evidence bag into which the pry bar had been placed. The paint samples scraped from the building were similar in composition to the paint sample found in the bag, such that the sample from the bag could have come from the rear entry door of the shop.

The brothers' vehicle was found some 400 feet away, in a parking area within an apartment complex north and east of the shop. Knopik noticed various tools, a citizens band radio, a radar detector, some paint cans, and a hand-held spotlight plugged into the cigarette lighter of the vehicle.

Both brothers testified at the trial. They described their paint striping business, which they began in 1986, as one that was primarily conducted at night, that being the time when parking lots were empty.

As they both lived in the Omaha area, they met at an Omaha area truckstop between 9 and 10 p.m. on November 4 to discuss finishing some paint striping work they had begun in some metropolitan area parking lots. Because weather conditions were not favorable and Ronald had developed a headache, they decided against painting. Instead, they drove to Lincoln between 11 p.m. and midnight to look at some parking lots they had previously striped and at others on which they had unsuccessfully bid.

Between 1 and 2 a.m., they arrived at a grocery store across from the shopping center which housed the shop to look at the grocery store's parking lot. They had unsuccessfully bid to work on it in the past and planned to rebid in the future. They next drove across the street to the shopping center in question, a property on which they had never bid but which they viewed as "a potential business connection." They claim to have then driven to an apartment complex located behind the shopping center, continuing their search for possible jobs to bid. They parked their vehicle near the alley behind the mall, where it was later found by Knopik.

The brothers contend that while at the apartment complex parking lot, they noticed that the alley behind the mall had speed bumps and poles such as they often painted in the course

of their business. They also noticed, from their view of the rear of the mall, a ventilation fan of a type typically found in restaurants. This interested them because they sometimes steam-cleaned restaurant areas which accumulated grease.

William stated that by this time his brother's headache had become more severe, so they decided to walk to the area behind the mall and look more closely at the potential work there, hoping that the fresh air would help alleviate his brother's pain. While William claimed to have followed his brother as they walked down the alley toward the shop, Ronald testified that he had walked behind William.

William also testified that as he and his brother walked down the alley, he came upon a pry bar lying on the ground near the dumpster at the shop. William first testified that he picked up the pry bar, decided he would like to have it, then thought that it probably belonged to someone who had been working on an automobile, and so he placed it "up close to the building" behind the Dumpster. On cross-examination, he testified that he mentioned the bar to his brother as he picked it up, but that Ronald told him, without looking at William's find, to "put it back we don't need anymore junk." Ronald testified he did not notice William picking up a pry bar or remember William telling him he had found anything, but stated that it was possible because William was "always picking up stuff."

The brothers claim that William next walked around the west side of the shop to check the parking stalls there while Ronald was looking inside the shop through a window in one of the rear doors to see if there was any interior paint striping. As William came back from looking at the west parking area, he tapped Ronald on the shoulder and said it was time to go. It was at about this time that Knopik drove around the corner and into the alley. William specifically denied having the pry bar in his hand at the time Knopik drove into the alley, insisting that he had placed it behind the Dumpster prior to that time. He had no explanation for Knopik's testimony in that regard, other than that Knopik was mistaken. William also was at a loss to explain Knopik's immediate location of the bar behind the Dumpster, positing only that "[m]aybe it's procedure." Although he admitted having gloves in his possession, William specifically

denied having them on when Knopik arrived.

Several witnesses testified that they had received bids from the brothers to do striping work; that the brothers had done striping work for them, including some indoor striping and at least one job in Lincoln; that such work was typically done at night; that they were aware of no occurrences of burglaries during the times the brothers were so working; and that the brothers had unsuccessfully bid jobs in Lincoln, for which they had been encouraged to rebid.

Each brother denied attempting to break into the shop.

## III. ANALYSIS

### 1. MOTIONS TO DISMISS

In the first summarized assignment of error, the brothers contend that the district court erred in overruling their motions to dismiss following the State's rest. This assignment has no merit.

A defendant who moves for a directed verdict at the close of the State's evidence and who, upon the overruling of such motion, proceeds with the trial and introduces evidence waives any error in the ruling on the motion for a directed verdict. *State v. Schwartz, ante* p. 84, 474 N.W.2d 461 (1991); *State v. Thomas,* 238 Neb. 4, 468 N.W.2d 607 (1991). As noted in part II above, the brothers chose to introduce evidence following the denial of their motions for dismissal.

The motions for dismissal, wherein the brothers sought to have the charges against them dismissed for the State's alleged failure to make out a prima facie case, were substantively identical to motions for directed verdict. Thus, the foregoing rule applies, and any claim of error the brothers wished to lodge against the district court's overruling of said motions was waived.

### 2. SUFFICIENCY OF EVIDENCE

In the second summarized assignment of error, the brothers claim that in any event the district court should not have submitted the case to the jury because the evidence was insufficient. They urge not only that the evidence was circumstantial and subject to many interpretations, but that it

failed to establish the corpus delicti and failed to identify the brothers as the perpetrators of the crime charged.

We begin our analysis of this assignment by noting that the brothers were convicted of attempted burglary. Section 28-507(1) provides that a person "commits burglary if such person willfully, maliciously, and forcibly breaks and enters any real estate or any improvements erected thereon with intent to commit any felony or with intent to steal property of any value." According to § 28-201, one is guilty of an attempt to commit a crime if he or she

> (a) Intentionally engages in conduct which would constitute the crime if the attendant circumstances were as he believes them to be; or
>
> . . . .
>
> (2) When causing a particular result is an element of the crime, a person shall be guilty of an attempt to commit the crime if, acting with the state of mind required to establish liability with respect to the attendant circumstances specified in the definition of the crime, he intentionally engages in conduct which is a substantial step in a course of conduct intended or known to cause such a result.

(a) Nature of Circumstantial Evidence

Relying on language from *State v. Trimble,* 220 Neb. 639, 371 N.W.2d 302 (1985), the brothers argue that where circumstantial evidence is susceptible to multiple interpretations, the ambiguity must be resolved in their favor.

It is true that in *Trimble,* this court, in reversing the defendant's convictions of theft and second degree arson, stated:

> The test of the sufficiency of circumstantial evidence in a criminal prosecution is whether the facts and circumstances tending to connect the accused with the crime charged are of such a conclusive nature as to exclude to a moral certainty every rational hypothesis except that of guilt. *State v. Costanzo,* 203 Neb. 586, 279 N.W.2d 404 (1979).

220 Neb. at 643, 371 N.W.2d at 305.

The brothers' argument, however, overlooks that earlier, in

*State v. Buchanan*, 210 Neb. 20, 312 N.W.2d 684 (1981), this court, in an opinion which thoroughly examined the issue, abandoned the rule that a criminal conviction could not be based solely on circumstantial evidence unless the State disproved every hypothesis but that of guilt. Thenceforth, in criminal cases, circumstantial evidence has usually been treated the same as direct evidence; the State, upon review, is entitled to have all conflicting evidence, direct and circumstantial, viewed in its favor. See, *State v. Zitterkopf*, 236 Neb. 743, 463 N.W.2d 616 (1990); *State v. Saltzman*, 235 Neb. 964, 458 N.W.2d 239 (1990); *State v. Badami*, 235 Neb. 118, 453 N.W.2d 746 (1990); *State v. Reed*, 228 Neb. 645, 423 N.W.2d 777 (1988); *State v. Piskorski*, 218 Neb. 543, 357 N.W.2d 206 (1984); *State v. Evans*, 215 Neb. 433, 338 N.W.2d 788 (1983); *State v. Workman*, 213 Neb. 479, 329 N.W.2d 571 (1983).

*Trimble, supra*, demonstrates only that on occasion the ghost of a dead rule of law returns to temporarily haunt the halls of justice. In an effort to exorcise this mischievous spirit, we hereby reject the *Trimble* language which improvidently proclaims that a criminal conviction based solely on circumstantial evidence can stand only if the State has disproved every hypothesis but that of guilt.

### (b) Corpus Delicti

The brothers further argue that there was insufficient evidence to establish beyond a reasonable doubt the corpus delicti of the crime charged in that there was no adequate proof of an attempt to forcibly enter the shop.

"The corpus delicti is the body or substance of the crime, the fact that a crime has been committed, without regard to the identity of the person committing it." *State v. Sedlacek*, 178 Neb. 322, 326, 133 N.W.2d 380, 383 (1965). In other words, the corpus delicti in this case is the actual commission of attempted burglary. See *id*. While our law requires that the corpus delicti be proved beyond a reasonable doubt, *State v. George*, 228 Neb. 774, 424 N.W.2d 350 (1988), such proof may be established by circumstantial evidence, *Henn v. State*, 172 Neb. 597, 111 N.W.2d 385 (1961). "[C]ircumstantial evidence is proof of collateral facts and circumstances from which the

mind infers the conclusion that the fact sought to be established in fact existed." *State v. Lewis*, 177 Neb. 173, 177, 128 N.W.2d 610, 613 (1964). Accord *State v. Messersmith*, 238 Neb. 924, 473 N.W.2d 83 (1991).

The brothers argue that because there was no eyewitness to an attempt to forcibly enter the shop and because the State's evidence did not conclusively demonstrate that the entry door had been pried open, the corpus delicti was not proven beyond a reasonable doubt.

There is no merit to this claim. The testimony that the marks on the entry door and jamb were consistent with marks found on other doors through which forcible entry had been attained, that the marks were freshly made, and that the doorknob was noticeably looser on November 5 than it had been when the owner left the shop on the previous evening permitted the jury to infer that an attempt to forcibly enter the shop was made on the morning of November 5. Contrary to the brothers' professed belief, there is no requirement that the State make a conclusive showing of the attempt or that there be an eyewitness account of such an endeavor. The State sustains its burden by introducing evidence from which the finder of fact may reasonably make the required inferences.

### (c) Identity of Perpetrators

In arguing that the evidence fails to sufficiently establish that they were the perpetrators of the crime, the brothers make much of the fact that their version of the events of November 5 is plausible. That is certainly so, but the jury was under no requirement to believe their version of the events. *State v. Pelton*, 197 Neb. 412, 249 N.W.2d 484 (1977); *State v. Fowler*, 193 Neb. 420, 227 N.W.2d 589 (1975). The evidence establishing the corpus delicti, combined with the evidence which places the brothers at the scene, coupled with the testimony that William was seen carrying a pry bar while wearing gloves, supports the verdicts and consequently supports the judgments of the district court.

### 3. Performance of Trial Counsel

In the third summarized assignment of error, the brothers allege that the failure of their trial attorneys to move the court

for directed verdicts at the close of all the evidence or for judgments notwithstanding the verdicts constitutes ineffective assistance of counsel. The State, relying on *State v. Dixon*, 223 Neb. 316, 389 N.W.2d 307 (1986), claims that this issue is not properly before us because it has not been ruled upon by the trial court.

In *Dixon, supra*, this court did indeed refuse to entertain a claim of ineffective assistance of counsel raised for the first time on direct appeal. However, the *Dixon* court did not establish a rule barring such appellate claims in all circumstances; the determining factor is whether the record is sufficient to adequately review the question. "[W]hen the issue has not been raised nor ruled on by the trial court *and* necessitates an evidentiary hearing, we will not address the matter." (Emphasis supplied.) *Dixon, supra* at 321, 389 N.W.2d at 310.

Several decisions of this court clearly demonstrate that claims of ineffective assistance of counsel raised for the first time on direct appeal are not ipso facto to be dismissed. See, e.g., *State v. Dean*, 237 Neb. 65, 464 N.W.2d 782 (1991); *State v. Sanders*, 235 Neb. 183, 455 N.W.2d 108 (1990); *State v. Jones*, 235 Neb. 1, 453 N.W.2d 447 (1990). In these cases now before us, because the ineffective assistance of counsel claim is directed specifically at the aforedescribed failures on the part of trial counsel, and in light of the resolution of the brothers' sufficiency of the evidence claims, no further evidentiary hearing is necessary, and the issue may thus properly be addressed at this time.

We note here that a motion for judgment notwithstanding the verdict, provided for by Neb. Rev. Stat. § 25-1315.02 (Reissue 1989), is limited to civil proceedings, there being no mention of such a remedy in Neb. Rev. Stat. §§ 29-2101 to 29-2106 (Reissue 1989), which detail remedies dealing with criminal procedure after a guilty verdict is entered in a criminal action. *State v. Torrence*, 192 Neb. 720, 224 N.W.2d 177 (1974), *disapproved on other grounds*, *State v. Harney*, 237 Neb. 512, 466 N.W.2d 540 (1991). Thus, the issue before this court is limited to whether the brothers received ineffective assistance of counsel because of their attorneys' failure to move

the trial court for directed verdicts at the close of all the evidence.

To sustain a claim of ineffective assistance of counsel, a defendant is required to show that counsel's performance was deficient and that such deficient performance prejudiced the defense such that the results of the proceedings would have been different but for counsel's deficient performance. *State v. Dixon*, 237 Neb. 630, 467 N.W.2d 397 (1991). However, where a defendant is unable to demonstrate sufficient prejudice, no examination of whether counsel's performance was deficient is necessary. *State v. Sanders, supra*.

A directed verdict in a criminal case is proper only when there is a complete failure of evidence to establish an essential element of the crime charged or when the evidence is so doubtful in character, lacking probative value, that a finding of guilt based on such evidence cannot be sustained. *State v. Thomas*, 238 Neb. 4, 468 N.W.2d 607 (1991). In this court's consideration of a defendant's motion for a directed verdict, the State is entitled to have all its relevant evidence accepted as true, every controverted fact resolved in its favor, and every beneficial inference reasonably deducible from the evidence. *Id*.

The discussion in part III(1), in which the propriety of the jury's verdicts was analyzed, demonstrates that a motion for directed verdicts at the close of the evidence could not have been properly sustained. Therefore, the brothers have demonstrated no prejudice by their attorneys' failure to move the trial court for directed verdicts at the close of all the evidence.

### 4. JURY CHARGE

In the fourth summarized assignment of error, the brothers, through a supplemental brief filed pursuant to leave, contend that in light of *Cage v. Louisiana*, \_\_\_\_ U.S. \_\_\_\_, 111 S. Ct. 328, 112 L. Ed. 2d 339 (1990), which was decided during the pendency of these appeals, the jury was improperly charged concerning the State's burden of proof. More specifically, the brothers claim that a particular instruction misled the jury into finding them guilty on the basis of a lesser quantum of proof than is required under the due process clause of U.S. Const.

amend. XIV by inaccurately defining the "reasonable doubt" concept.

We begin our analysis of this issue by recalling that in order to comport with the due process clause of the 14th amendment, criminal convictions may be had only upon proof beyond a reasonable doubt of every fact necessary to constitute the crime for which a defendant is charged. *In re Winship*, 397 U.S. 358, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970). *Cage, supra*, demonstrates that where a court improperly defines the concept of reasonable doubt in its instructions to a jury, the mandate of *Winship* is not met, and due process is thus not accorded. *Cage* also reaffirms that upon review of a jury instruction, an appellate court is to consider how reasonable jurors could have understood the instruction as a whole. See *Francis v. Franklin*, 471 U.S. 307, 105 S. Ct. 1965, 85 L. Ed. 2d 344 (1985).

With these concepts in mind, we turn to a comparison of the *Cage* instruction with the instruction in these cases.

The *Cage* instruction read, in pertinent part:

> " 'If you entertain a reasonable doubt as to any fact or element necessary to constitute the defendant's guilt, it is your duty to give him the benefit of that doubt and return a verdict of not guilty. Even where the evidence demonstrates a probability of guilt, if it does not establish such guilt beyond a reasonable doubt, you must acquit the accused. This doubt, however, must be a reasonable one; that is one that is founded upon a real tangible substantial basis and not upon mere caprice and conjecture. *It must be such doubt as would give rise to a grave uncertainty*, raised in your mind by reasons of the unsatisfactory character of the evidence or lack thereof. A reasonable doubt is not a mere possible doubt. *It is an actual substantial doubt*. It is a doubt that a reasonable man can seriously entertain. What is required is not an absolute or mathematical certainty, but a *moral certainty*.' State v. Cage*, 554 So.2d 39, 41 (La.1989) . . . ."

(Emphasis in original.) 111 S. Ct. at 329.

In a unanimous opinion, the U.S. Supreme Court concluded that the instruction violated the due process clause of the 14th amendment, saying:

In construing the instruction, we consider how reasonable jurors could have understood the charge as a whole. [Citation omitted.] The charge did at one point instruct that to convict, guilt must be found beyond a reasonable doubt; but it then equated a reasonable doubt with a "grave uncertainty" and an "actual substantial doubt," and stated that what was required was a "moral certainty" that the defendant was guilty. It is plain to us that the words "substantial" and "grave," as they are commonly understood, suggest a higher degree of doubt than is required for acquittal under the reasonable doubt standard. When those statements are then considered with the reference to "moral certainty," rather than evidentiary certainty, it becomes clear that a reasonable juror could have interpreted the instruction to allow a finding of guilt based on a degree of proof below that required by the Due Process Clause.

111 S. Ct. at 329-30.

The questioned instruction in the cases now before us reads:

"**Reasonable doubt**" is such a doubt as would cause a reasonable and prudent man, in one of the graver and more important transactions of life, to pause and hesitate before taking the represented facts as true and relying and acting thereon. It is such a doubt as will not permit you, after full, fair, and impartial consideration of all the evidence, to have an abiding conviction, to a moral certainty, of the guilt of the accused. At the same time, absolute or mathematical certainty is not required. You may be convinced of the truth of a fact beyond reasonable doubt and yet be fully aware that possibly you may be mistaken. The jury may find an accused guilty upon the strong probabilities of the case, provided such probabilities are strong enough to exclude any doubt of his guilt that is reasonable. A reasonable doubt is an actual and substantial doubt reasonably arising from the evidence, from the facts and circumstances shown by the evidence, or from the lack of evidence on the part of the State, as distinguished from a doubt arising from mere possibility, from bare imagination, or from fanciful

conjecture.

The brothers assert that the questioned instruction is strikingly similar to the *Cage* instruction, and thus postulate that the questioned instruction must be deemed unconstitutional and their convictions accordingly reversed.

Such, however, is not the case. It is true that both the *Cage* instruction and the questioned instruction tell the jury that, in effect, a reasonable doubt is an actual and substantial one. But while the *Cage* instruction also equates a reasonable doubt with a grave one, the questioned instruction does not. The questioned instruction merely advises that a reasonable doubt is such as would cause a person "to pause and hesitate" when considering one of the "graver and more important transactions of life." Moreover, while a reasonable reading of the *Cage* instruction leads to the conclusion that an accused is to be convicted unless such doubt rises to the level of a moral certainty, the questioned instruction permits conviction only if the lack of such doubt is established to a moral certainty. In other words, under the *Cage* instruction a juror is to vote for conviction unless convinced to a moral certainty that there exists a reasonable doubt, whereas under the questioned instruction a juror is to vote for acquittal unless convinced to a moral certainty that no reasonable doubt exists. Those are two very different instructions; indeed, one contradicts the other. We therefore conclude that the questioned instruction in these cases does not lessen the State's burden of proof below the requisite reasonable doubt standard; the questioned instruction thus does not run afoul of the due process requirements of U.S. Const. amend. XIV.

We note that a number of courts likewise have distinguished the instructions challenged before them from the *Cage* instruction on a variety of grounds. E.g., *Adams v. State*, 587 So. 2d 1265 (Ala. Crim. App. 1991) (convict if convinced beyond a reasonable doubt and to moral certainty of guilt; defines reasonable doubt as not capricious, fanciful, vague, or imaginary, but as actual and substantial doubt arising from consideration of evidence or lack of it); *People v. Jennings*, 53 Cal. 3d 334, 807 P.2d 1009, 279 Cal. Rptr. 780 (1991) (acquit if juror lacks abiding conviction of truth of charge); *State v.*

*Jones*, 582 So. 2d 973 (La. App. 1991) (convict if convinced beyond a reasonable doubt, such being not a possible doubt, but an actual or substantial one such as reasonable person would seriously entertain, a serious doubt for which juror could give good reason); *State v. Turner*, 810 S.W.2d 92, 94 (Mo. App. 1991) (convict if " 'firmly convinced of the defendant's guilt' "). Accord *Lord v. State*, _____ Nev. _____, 806 P.2d 548 (1991) (convict if exists an abiding conviction of truth of charge, for there is then not a reasonable doubt, such a doubt being not a mere possible doubt, but one based on reason, one as would govern or control in more weighty affairs of life). Followed, *Felder v. State*, _____ Nev. _____, 810 P.2d 755 (1991); *Riley v. State*, _____ Nev. _____, 808 P.2d 551 (1991).

### 5. PROPRIETY OF SENTENCES

In the fifth summarized assignment of error, the brothers, arguing that the sentences imposed are excessive and constitute an abuse of discretion, specifically ask this court to reduce them to probation.

Attempted burglary is a Class IV felony and, as such, carries a maximum sentence of 5 years' imprisonment, a $10,000 fine, or both such imprisonment and fine. §§ 28-507 and 28-201 and Neb. Rev. Stat. § 28-105 (Reissue 1989). The oft-repeated rule in Nebraska is that the denial of probation and the imposition of a sentence within the statutorily prescribed limits will not be disturbed on appeal absent an abuse of discretion. *State v. Dean*, 237 Neb. 65, 464 N.W.2d 782 (1991).

Foremost among the brothers' claims is that the imposition of a jail sentence will prove devastating to their future employment opportunities and work great hardship on their dependents. While it is true that incarceration may work a hardship on the brothers' dependents and that their future employment opportunities might be limited by their incarceration, those facts, standing alone, do not demonstrate that the trial court abused its discretion in imposing the sentences in these cases. Indeed, the record demonstrates that the trial court was made aware of those circumstances. We find nothing in the record from which it can be said that the trial

court abused its discretion in imposing its sentences.

## IV. CONCLUSION
The record sustaining none of the summarized assignments of error, each of the judgments of the district court is affirmed.

AFFIRMED.