STATE OF NEBRASKA, APPELLEE, V. ROYAL D. LEWIS, APPELLANT.
488 N.W.2d 518

Filed August 28, 1992.    No. S-91-073.

Dennis R. Keefe, Lancaster County Public Defender, and Scott P. Helvie for appellant.

Don Stenberg, Attorney General, and Delores Coe-Barbee for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

GRANT, J.

The defendant, Royal D. Lewis, was originally charged in one information with 56 counts, consisting of 10 counts of robbery, 2 counts of first degree sexual assault, 2 counts of kidnapping, 14 counts of first degree false imprisonment, and 28 counts of using a firearm to commit a felony. Defendant pled not guilty to all counts.

The 56 counts dealt with four separate criminal episodes. The 12 counts in the first two of the episodes were consolidated for trial and are at issue in this appeal. The defendant moved to prohibit the joinder of the offenses and for separate trials as to each episode. After a hearing on the motion, the first 12 counts were joined for trial, and the other 44 counts were severed and eventually dropped.

In the first of the two episodes, the State charged, in six counts, that on or about July 23, 1989, in Lancaster County, defendant robbed the first victim, used a firearm to commit the felony of robbery, kidnapped the first victim, used a firearm to commit that kidnapping, subjected the first victim to sexual penetration, and used a firearm to commit that sexual assault.

In connection with the second episode, the State charged, in an additional six counts, that on or about July 24, 1989, in Lancaster County, defendant committed the same six crimes against a second victim.

After jury trial, defendant was convicted on all 12 counts. After a presentence investigation, and after the trial court found that defendant was not a mentally disordered sex offender, the court sentenced defendant to 8 to 10 years on each of the two robbery convictions, to 5 to 10 years on each of the six convictions for use of a firearm in the commission of a felony, to 8 to 10 years on each of the two kidnapping convictions, and to 8 to 10 years on each of the two convictions of sexual assault. The twelve sentences were to run consecutively to one another. This resulted in a total sentence of 78 to 120 years. Defendant timely appealed.

In this court, defendant assigns five errors. He contends that

the trial court erred (1) in joining counts I through VI with counts VII through XII, (2) in limiting defendant's right to confront and cross-examine witness Richard Pena, (3) in failing to find that the evidence was insufficient to support defendant's convictions, (4) in instructing the jury on reasonable doubt using NJI 14.08, and (5) in imposing an excessive sentence on defendant. We affirm.

The evidence at trial, viewed most favorably to the prosecution, as we must, *State v. Rokus*, 240 Neb. 613, 483 N.W.2d 149 (1992), established the following facts:

The first victim testified that after leaving work, she drove to the Super Saver grocery store on 27th and Cornhusker in Lincoln, Nebraska, at approximately 12:15 a.m. on July 23, 1989. She parked near the store, purchased two bags of groceries, and returned to her car. As she was unlocking her car, she saw a man approach her from behind. He was wearing a black crew neck T-shirt, denim shorts, and brown shoes without socks. He had the shirt up over his face so that she could only see his eyes and part of his nose. She stated that the man was black and had short, black, curly hair.

The man held his shirt over his face with one hand and held a gun with the other. He told the victim not to turn around, to unlock the car, and to get in. She entered the car through the driver's door and then slid over to the passenger side of the car. The assailant told the victim to put her head down between her legs, and then he entered the driver's side of the car. The assailant told the victim to put the keys in the ignition, which she did. He then told her that "he needed to borrow [her] car and that [she] had to go with him." He then started the car and drove off. As they were riding in the car, the assailant told the victim that he was not going to hurt her if she kept her head down and cooperated and that he needed her car for a robbery.

The victim stated that her assailant was holding the gun to her side while she was in the car. She described the gun as black, with a white handle, a long barrel, and a cylinder in the middle.

The assailant stopped the car, bound the victim's hands and ankles with electrical tape, pulled her shirt over her head, and taped it. Before the assailant taped the victim's shirt over her head, she saw the side of his face. She testified the assailant had

a thin mustache and the skin on his arm and leg was smooth, and she guessed that he was about 5 feet 10 inches tall and weighed about 155 pounds.

After the assailant had bound the victim, he left the car, and the victim heard him whispering with someone. She did not see the other car, but she did see headlights. When the assailant returned to the car, he asked the victim if she was a virgin. The assailant then pulled her jeans and underwear down to her ankles and digitally penetrated her vagina twice.

The assailant stopped assaulting the victim when a car drove up. He handed the victim's purse and groceries to someone in the other car. The assailant then drove off again with the victim in her car. She thought they drove for 10 or 15 minutes in the same vicinity before they stopped again. While they were driving, the victim remained seated with her head down between her legs.

When they stopped the second time, the assailant told her that he was going to meet his partner at that location, and if she did not keep her head down, his partner would shoot her. When the victim asked the assailant if he were not worried that someone would be killed during the robbery, he responded that he was not nervous because he had done this before.

While they were stopped the second time, the assailant forced the victim to perform oral sex while he held the gun to the back of her head. He then digitally penetrated her vagina a third time.

The victim heard a car drive up and saw its lights. The assailant wiped down the interior of her car with a black T-shirt and a sack, then pulled the keys out of the ignition with a metal object and threw them on the ground outside the car. He took the victim's watch and ring, got in the other car, and left.

After the victim heard the other car leave, she crawled to the other side of her car, opened the door, and retrieved the keys from the ground. She did not recall whether her hands had slipped out of the tape or if she had pulled it apart, but she testified that it was not tight. She drove away, trying to figure out where she was. A police car pulled her over at about 1:30 a.m. because she was driving erratically. The officer testified that the victim was disheveled, crying, and distraught.

The police had the victim retrace her route to where she had started driving after her assailant left, and they determined that it was behind a dental clinic at 14th and Cornhusker. The police then took the victim to the station, where she made a formal statement, and photographs were taken of the tape marks on her arms and face. The victim viewed both a photo lineup and a live lineup, but was unable to identify her assailant; nor was she able to identify defendant at trial as her assailant.

In connection with the second episode, the record shows that on July 23, 1989, the second victim worked alone from 6 to 11 p.m. at the Baskin Robbins at 48th and Van Dorn. She closed the store at 11 p.m., cleaned, and put the money from the register, both bills and coins, into a bank bag in the freezer before leaving at about 12:15 a.m. on July 24. She did not turn off the night lights, which lit the store well even when it was closed, and locked the door from the outside.

The victim walked to her car, which was parked about a block away in the parking lot of Van Dorn Plaza. She noticed a man walking toward her car. As she fumbled with the lock, the man walked up to her, pointed a gun at her, and told her to get in the car.

The victim described the gun as black, with a long barrel and a cylinder. She described her assailant as black, with short, curly hair and large, round eyes, wearing a black turtleneck, pulled up over his nose, and jeans. She stated he was "a little taller than me." The victim is 5 feet 5 inches tall.

The victim got in the driver's side door and slid over into the passenger seat, and her assailant entered the driver's seat. He told her to put the keys in the ignition, which she did. He had her turn the key to start the car. The assailant drove to the front of the Baskin Robbins. He had the victim remove the key for the business' door from her keyring while the car was running, all the while keeping the gun on her.

Both the victim and the assailant got out of the car, and he followed her into the store after she unlocked it. The victim opened the freezer, and the assailant took the money. When they left the store, the victim started to lock the door, but the assailant told her to leave it open. She asked that she be left at the store, but the assailant told her to get back in the car, which

she did.

When they were in the car, the assailant told the victim to put her head down between her knees. He drove north on 48th and then west on Normal, but then the victim became disoriented and could no longer tell where they were going. The assailant stopped the car, shut it off, and asked the victim if she had a towel with which he could wipe his fingerprints out of the car. She offered some tissues, but he told her to take her sweatshirt off, and he wiped down the car with that.

The assailant then fondled the victim's breast through her T-shirt and digitally penetrated her vagina. While assaulting her, the assailant asked the victim if she was a virgin.

The assailant then wiped the steering wheel off again and told the victim that he was leaving her keys in the corner of the car, that she should wait 15 minutes before she left because he was going to watch her, and that the gun had bullets in it.

After the assailant left, the victim retrieved the keys, waited 5 to 7 minutes, drove off, and determined she was at 31st and C Streets. She drove home and told her roommate what had happened, and they called the police. The police arrived around 1:45 a.m. on July 24, took a statement, and revisited the locations with the victim. The officer reported that the victim was upset, but coherent.

The second victim viewed a photo lineup on the afternoon of July 24, the same day she was assaulted. She selected two photos that she thought were similar to her assailant. The photo which she thought was most similar was of defendant. She told the officer that she would like to see full-length photos of the individuals. The officer returned the next day with full-length photos. The victim again picked out the same two suspects, including defendant.

The second victim also viewed a live lineup on August 26, 1989, from which she identified the defendant as her assailant. She testified she was "ninety-nine percent sure" at the lineup that defendant was her assailant, particularly after she heard his voice. In addition, she identified defendant in the courtroom as her assailant. She stated she was "ninety-nine point nine" percent sure that defendant was the assailant, but there was still some doubt in her mind.

Richard Pena was a friend of defendant's. He testified as part of a plea bargain with the county attorney's office, in which "a charge of aiding the consummation of any felony and habitual criminal would be amended to a simple misdemeanor charge, not including a habitual criminal allegation, in exchange for his testimony in this case against Royal Lewis." Pena's four previous felony convictions and his current plea bargain were disclosed to the jury.

Pena testified that he had known defendant for 20 years. He testified that the day after the second robbery, he and defendant were listening to Pena's police scanner, when they heard that the police were looking for a suspect named "Hobart" in connection with either the Super Saver or Baskin Robbins crimes. Pena commented to defendant that the suspect was in "serious trouble," and defendant stated that the police were looking for the wrong person. Pena testified that defendant then stated that he had committed the Super Saver and Baskin Robbins crimes and that his girl friend was very upset with him because she had read in the paper about the sexual assaults.

Dawn Garcia was defendant's girl friend. She testified that she had known defendant for about 2 years, and the summer that the two victims were assaulted, she and defendant were living together.

Garcia testified that she and defendant drove to the Super Saver on 27th and Cornhusker at about midnight on July 23, 1989. Defendant told Garcia that he was going to rob a woman, but the couple made no further plans. Garcia testified that she knew defendant owned a gun, but she did not see it that night. She said that defendant's gun was brown, with a tan handle and long barrel. She testified that defendant was wearing a black turtleneck and denim shorts.

Garcia testified that after reaching Super Saver, she saw defendant approach a woman in the parking lot, saw her get into the car, and saw defendant enter the car after her. She said defendant drove off, and she followed him to 14th Street, where defendant stopped. Garcia did not remember if she talked to defendant, but when he drove off again, she followed him to 14th and Yolande. She waited for defendant to park the woman's car, and then he joined Garcia with a sack containing

groceries and the woman's purse. Garcia and defendant then went home.

Garcia further testified that she was with defendant the subsequent night when he committed another robbery. They drove to the Baskin Robbins at 48th and Van Dorn at about 11 p.m., arriving when the store was still open. They parked in the parking lot and waited for the employee to lock up the store. As the employee was walking toward her car, defendant approached her. Garcia did not know whether defendant had his gun. She testified that defendant was wearing a black turtleneck shirt and denim shorts.

Garcia stated that the woman entered the car, and then defendant entered the car. Garcia watched them drive back to the store and enter it. They remained inside a "couple minutes," and then got back in the car and drove off. Garcia followed the car to 31st and C Streets, where defendant joined her, carrying a bank bag, which contained about $300 in bills and change.

Garcia testified as part of a plea bargain. She was charged with three felony accessory to robbery charges, which were dropped to one misdemeanor. This information was disclosed to the jury, as were Garcia's prior felonies and crimes of dishonesty. In addition, Garcia testified that she and defendant had broken off their relationship, that Garcia was angry at defendant, and that she told defendant that she could "stick him with a felony by just talking to the police."

Defendant testified on his own behalf. He denied committing the crimes with which he was charged. He denied ever having a conversation with Pena in which he admitted committing the crimes. He admitted owning a black turtleneck. He could not remember where he was at the time any of the crimes occurred.

Defendant testified that he broke off his relationship with Garcia in December. He testified that Garcia told him that "she can basically get me locked up any time she felt like it, and she said all she has to do was call somebody because Detective Sorensen wanted me real bad anyway. She could get me picked up whenever she got ready."

Defendant first contends that the joinder of counts I through VI (the crimes of July 23) and counts VII through XII (the

crimes of July 24) was improper and that the joinder of the two criminal episodes violated defendant's rights to a fair trial and due process of law.

A trial court's ruling on a motion for consolidation of charges properly joinable will not be disturbed in the absence of an abuse of discretion. *State v. Clark*, 228 Neb. 599, 423 N.W.2d 471 (1988). See, also, *State v. Evans*, 235 Neb. 575, 456 N.W.2d 739 (1990).

> There is no constitutional right to a separate trial. The right is statutory, as set out in § 29-2002(4), and depends upon a showing that prejudice will result from a joint trial.
> . . . The burden is on the party challenging the joint trial to demonstrate how and in what manner he or she was prejudiced.

*Clark*, 228 Neb. at 603, 423 N.W.2d at 474. See, also, *Evans, supra.*

The statute controlling the joinder of trials, Neb. Rev. Stat. § 29-2002 (Reissue 1989), states:

> (1) Two or more offenses may be charged in the same indictment, information, or complaint in a separate count for each offense if the offenses charged, whether felonies or misdemeanors, or both, are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan.
>
> . . . .
> (4) If it appears that a defendant or the state would be prejudiced by a joinder of offenses or of defendants in an indictment, information, or complaint, or by such joinder of offenses in separate indictments, informations, or complaints for trial together, the court may order an election for separate trials of counts, indictments, informations, or complaints, grant a severance of defendants, or provide whatever other relief justice requires.

Contentions similar to defendant's contentions in this case were before the court in *State v. Nance*, 197 Neb. 95, 246 N.W.2d 868 (1976), *overruled on other grounds, State v. Sanders*, 235 Neb. 183, 455 N.W.2d 108 (1990). In that case, the

court consolidated two separate robberies. The similarities, roughly, were that the robberies occurred on consecutive days and that the assailant entered business places (a garage and an office) for allegedly valid reasons (needing repairs, seeking a job), robbed an employee, restrained the employee (in the trunk of a car and in a restroom), and left. Both victims positively identified the defendant. We stated:

> We are of the opinion that the two robberies referred to were "of the same or similar character" under the Nebraska statute . . . notwithstanding the fact that the offenses were committed against two different individuals, and with approximately 19 hours intervening between the commission of the offenses. . . .
>
> . . . .
>
> Although defendant contends that it is inherently prejudicial to be defending on several unrelated counts at the same time because they will tend to enforce each other, he has made no actual showing of how he was, or may have been, prejudiced. . . . The evidence on each robbery was distinct and simple. The trial court separately instructed the jury on the elements of each count, and a further instruction provided: "The material elements of each count will be considered separately by you and a separate determination made as to each Count."

*Nance*, 197 Neb. at 103-05, 246 N.W.2d at 872-73.

The two criminal episodes in the case before us contain such similarities. Both groups of six offenses contain exactly the same crimes. The episodes occurred merely 24 hours apart. Both victims were attacked shortly after midnight in parking lots by a man holding his shirt over his face. Both victims described similar guns. In each case, the assailant forced the victim to enter her car in the same manner, through the driver's door into the passenger seat. In each episode, the victim was forced to put the keys in the ignition. In each instance, the victim was instructed to sit with her head between her knees so the victim could not see where the attacker was driving the car. In each case, before or during the sexual assaults, both of which included digital penetration, the attacker asked the victim if she was a virgin. In each case, the assailant wiped down the inside

of the car with a shirt to remove fingerprints before he left. Both victims described their assailant in a similar manner. We determine that the two criminal episodes were of "the same or similar character."

Defendant complains that no instruction was given that limited the purposes for which the jury could consider the evidence. The defendant, however, did not request any different instruction, nor complain of the instruction given. "[F]ailure to object to an instruction after it has been submitted to counsel for review will preclude raising an objection on appeal absent plain error indicative of a probable miscarriage of justice." *State v. Lohman*, 237 Neb. 503, 505, 466 N.W.2d 534, 536 (1991). " '[A] party who desires more precise jury instructions must request them at the time the instructions are being considered and not on appeal.' " *State v. Lenz*, 227 Neb. 692, 694-95, 419 N.W.2d 670, 672 (1988).

The facts before us are sufficient for the jury to find appellant guilty of the July 23 crimes without any consideration of the July 24 crimes. Defendant's former girl friend testified that she had helped in the commission of both robberies, and another friend of defendant's testified that defendant had admitted crimes against both victims. Sufficient evidence existed for the jury to find defendant guilty of the July 23 crimes, without any consideration of the July 24 crimes.

The trial court did not err in joining the 12 counts for trial. Defendant's first assignment of error is without merit.

In his second assignment of error, defendant contends that the trial court improperly restricted his right to cross-examine a witness against him, because the court did not allow him to examine Richard Pena about a forgery charge pending against Pena. Defendant agreed that the pending charge was not a prior conviction under Neb. Rev. Stat. § 27-609 (Reissue 1989) and that the pending charge was not part of the plea bargain into which Pena entered in exchange for testimony in this case. Defendant contends that evidence of the pending charge is relevant to show that Pena was biased in favor of the State because Pena was seeking leniency on the pending forgery charge.

Evidence showing bias of a witness is relevant. " '[C]ross-

examination is proper as to anything tending to affect the accuracy, veracity, or credibility of the witness' . . . 'anything within the knowledge of a witness tending to rebut evidence given on direct examination is admissible as a matter of right on cross-examination.' " *State v. Thaden*, 210 Neb. 622, 627, 316 N.W.2d 317, 321 (1982); *State v. Sutton*, 231 Neb. 30, 434 N.W.2d 689 (1989).

This court has modified those general rules. We have held:

> The right of cross-examination is an essential and fundamental requirement of a fair trial, and a defendant is entitled to engage in searching and wide-ranging cross-examination, including anything tending to affect the accuracy, veracity, or credibility of a witness. . . . However, a ruling on evidence of a collateral matter but intended to affect the credibility of a witness falls within the discretion of a trial court, and absent an abuse of discretion, a trial court's ruling on such evidence is not grounds for reversal.

*State v. Williams*, 219 Neb. 587, 590, 365 N.W.2d 414, 416 (1985). We also have held:

> When the object of the cross-examination is to collaterally ascertain the accuracy or credibility of the witness, some latitude should be permitted, and the scope of such latitude is ordinarily subject to the discretion of the trial judge, and, unless abused, its exercise is not reversible error.

*State v. Ballard*, 237 Neb. 729, 731, 467 N.W.2d 662, 664 (1991).

In *State v. Vicars*, 207 Neb. 325, 299 N.W.2d 421 (1980), the court refused to allow testimony relating to the credibility of the witness-victim. We found that there was no abuse of discretion because "sufficient evidence was admitted which reflected upon the truth and veracity of the complaining witness," including the fact that the witness had admitted to a friend that she was lying about the incident. *Vicars*, 207 Neb. at 332, 299 N.W.2d at 426.

Likewise, in the case before us, sufficient evidence was admitted reflecting Pena's veracity. The evidence before the jury showed that Pena had four prior felony convictions,

including one for a crime of dishonesty. Evidence was also adduced that Pena's plea bargain with the county attorney consisted of reducing one felony count, with habitual criminal sentencing enhancement, to a misdemeanor. The trial court did not err in the manner it permitted defense counsel to cross-examine Pena. Defendant's second assignment of error is without merit.

Defendant's third assignment of error contends that the trial court's instruction regarding reasonable doubt is improper in light of *Cage v. Louisiana*, 498 U.S. 39, 111 S. Ct. 328, 112 L. Ed. 2d 339 (1990). The reasonable doubt instruction used in the case before us, NJI 14.08, is identical to the instruction at issue in *State v. Morley*, 239 Neb. 141, 474 N.W.2d 660 (1991), which instruction we found complied with the requirements of *Cage*. Defendant's third assignment of error is without merit.

Defendant next contends in his fourth assignment of error that the evidence was insufficient as a matter of law to support the jury's guilty verdicts.

"In determining whether evidence is sufficient to sustain a conviction in a jury trial, an appellate court does not resolve conflicts of evidence, pass on credibility of witnesses, evaluate explanations, or reweigh evidence presented to a jury, which are within a jury's province for disposition. A verdict in a criminal case must be sustained if the evidence, viewed and construed most favorably to the State, is sufficient to support that verdict." . . .

"On a claim of insufficiency of evidence, an appellate court will not set aside a guilty verdict in a criminal case where such verdict is supported by relevant evidence. Only where evidence lacks sufficient probative force as a matter of law may an appellate court set aside a guilty verdict as unsupported by evidence beyond a reasonable doubt."

*State v. Rokus*, 240 Neb. 613, 619-20, 483 N.W.2d 149, 153 (1992).

The only element that appellant contests is the issue of identity. As detailed above, both victims described their assailants, and the descriptions generally fit the defendant. One of the victims identified defendant, both at trial and in lineups, stating that she was "ninety-nine percent sure" that defendant

was her assailant. Pena, a former friend of defendant, testified that defendant admitted committing the crimes. Garcia, defendant's former girl friend, testified that she was with defendant when he committed the crimes and that she aided in their commission. We hold that there was sufficient evidence in this case to support the convictions. Defendant's fourth assignment of error is without merit.

In his fifth assignment of error, defendant contends that his sentences were excessive. A sentence imposed within the statutory limits will not be set aside as excessive absent an abuse of discretion by the trial court. *State v. Muratella*, 240 Neb. 567, 483 N.W.2d 128 (1992); *State v. Stahl*, 240 Neb. 501, 482 N.W.2d 829 (1992). First degree sexual assault, Neb. Rev. Stat. § 28-319(2) (Reissue 1989); robbery, Neb. Rev. Stat. § 28-324(2) (Reissue 1989); and kidnapping, Neb. Rev. Stat. § 28-313(3) (Reissue 1989), are all Class II felonies, subject to sentences of 1 to 50 years' imprisonment. Use of a firearm to commit a felony is a Class III felony, Neb. Rev. Stat. § 28-1205(2) (Reissue 1989), subject to a sentence of 1 to 20 years' imprisonment, a $25,000 fine, or both.

Section 28-1205(3) provides that the use of a weapon in the commission of a felony "shall be treated as a separate and distinct offense from the felony being committed, and sentences imposed under the provisions of this section shall be consecutive to any other sentence imposed." We have held that this language is mandatory and that the trial court has no discretion to order that the sentences on the convictions for using a firearm be served in any way except consecutively. *State v. Trevino*, 230 Neb. 494, 432 N.W.2d 503 (1988); *State v. Winchester*, 239 Neb. 535, 476 N.W.2d 862 (1991).

Defendant, age 38, has a significant criminal history, including a 1969 conviction for larceny from the person and 1973 convictions for robbery; for shooting with intent to kill, wound, or maim; and for use of a firearm in the commission of a felony. A lesser sentence would depreciate the seriousness of the crimes of which defendant is convicted. The crimes against these victims were brutal and terrifying. Defendant's convictions and sentences are affirmed.

AFFIRMED.