STATE OF NEBRASKA, APPELLEE, V. RANDY DRINKWALTER,
APPELLANT.
493 N.W.2d 319

Filed December 11, 1992.   No. S-91-487.

David C. Huston and John R. Higgins, Jr., of Paine, Huston & Higgins, and David T. Schroeder for appellant.

Don Stenberg, Attorney General, and J. Kirk Brown for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

PER CURIAM.

The appellant, Randy Drinkwalter, was convicted of first degree murder and use of a deadly weapon to commit a felony in the beating death of Esther Drinkwalter. The defendant was sentenced to death on the murder count and to imprisonment for 6 to 12 years on the weapon count.

Upon appeal, the defendant has assigned as error that the trial court erred (1) in permitting the defendant's cousin, Jim Drinkwalter, to testify that the victim told him some 5 months prior to her murder that she was fearful of the defendant, over objection on foundation, relevancy, and hearsay grounds; (2) in failing to strike an expert's conclusion that fragments of glass found in a rug in the defendant's apartment were from the scene of the crime; (3) in instructing the jury at the commencement of the trial that "in a criminal case the judge determines only whether or not there is enough evidence to support a verdict"; and (4) in defining "premeditation" and "reasonable doubt" in the instructions to the jury both at the commencement of the trial and in its final instructions to the jury.

In reviewing a criminal conviction, an appellate court must view the evidence in the light most favorable to the prevailing party. An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence. Such matters are for the finder of fact, and the verdict will be affirmed, in the absence of prejudicial error, if properly

admitted evidence, viewed and construed most favorably to the State, is sufficient to support the conviction. *State v. Davis*, 240 Neb. 631, 483 N.W.2d 554 (1992). See, also, *State v. Houser*, 241 Neb. 525, 490 N.W.2d 168 (1992).

On appeal, the defendant does not challenge the sufficiency of the evidence to sustain his conviction. In that respect the record shows that the victim, who was the defendant's grandmother, was 87 years of age and lived by herself in a duplex in Valentine, Nebraska.

At approximately 10 p.m. on November 1, 1989, the victim's neighbor, Emma Ohlmann, heard a knocking sound on the wall that separated the victim's and Ohlmann's duplex. Ohlmann also heard a noise that sounded like a chair dropping. After a failed attempt to reach the victim by telephone, Ohlmann contacted Don Kenan, a next door neighbor. Kenan immediately walked over to the duplex to check on the victim and found the door of her apartment to be ajar. When Kenan entered the apartment, he discovered the victim's nude body lying on the floor.

Melvin Christiansen, the sheriff of Cherry County, who investigated the murder, testified that when he entered the apartment he saw the badly mutilated body of a female lying inside the door of the apartment next to a couch. A large amount of tissue from the head was lying on the floor. Some brain tissue, bone fragments, and a large amount of blood were near the head of the body. A 16-ounce ball peen hammer was lying on the floor next to the head. A knife was visible embedded in the victim's face directly below the eye.

Sheriff Christiansen also testified that only one drawer in the kitchen of the apartment was open, which drawer appeared to contain various tools. The victim's body was nude, but clothing was found next to a table in the same room. Four photographs were lying on or near the body. The photographs appeared to be family-type photographs that came from broken picture frames that had been hanging on the south wall of the apartment. A pack of Marlboro cigarettes was lying on the back of the victim. Several cigarettes were lying on the floor by the arm of the victim in a pool of blood. Broken glass from the broken picture frames lay on the floor and on the davenport. Two

cigarette butts were found in the apartment. The telephone cord to the telephone in the living room had been cut. Sheriff Christiansen also testified that there was no sign of forced entry to the victim's apartment.

On November 2, 1989, Dr. Joe Auch Moedy performed an autopsy on the victim's body in Kearney, Nebraska. Dr. Auch Moedy testified that the victim's face showed evidence of very extensive injury, including multiple wounds causing jagged, irregular lacerations, incised wounds, and fractures of the bones of the face and the skull. An ordinary table knife was embedded in the face just below the left eye, entering into the left maxillary sinus. A great deal of dried blood was present on the victim's face, on her chest, and on her abdomen. Dried blood was also present on the victim's legs and arms. According to Dr. Auch Moedy, the cause of the victim's death was multiple wounds of the head, face, and brain. The injuries to the victim's head were consistent with both blunt trauma and sharp, incised trauma. Dr. Auch Moedy also testified to multiple fractures of the bones of the face and skull. Some of the bone fragments had indentations in them that were consistent with a blow caused by a hammer. Dr. Auch Moedy testified that it was not possible to count the actual number of individual wounds to the head and face, but he estimated the number of blows to be at least 10 and as many as 20. A number of injuries to the victim's ribs were described as mirror fractures and were consistent with a heavy individual sitting on the victim. Dr. Auch Moedy testified that in his opinion, the victim was alive when the blows to her head first started. However, he believed that she was dead at the time the knife was inserted in her face, based on no evidence of active bleeding into the tissues surrounding the knife. However, he stated that it was possible that the victim was alive when the knife was inserted. There was also evidence that the victim tried to defend herself against her assailant, based on the presence of a defense wound on the back of one of the victim's hands.

The defendant, Randy Drinkwalter, is 27 years old, is 6 feet 4 inches tall, and weighs approximately 425 pounds. The murder investigation did not begin to center on the defendant until the day following the murder. At the time of the murder, the

defendant was employed as a mechanic at Hass Texaco Oil station in Valentine, Nebraska. James Lutter, chief of police of the Valentine Police Department, testified that on the day after the murder, he met with the defendant at approximately 11 a.m. at the defendant's place of employment. Lutter noticed four scratch marks across the back of the defendant's left hand that appeared to be fresh. At that time the defendant told Lutter that on the previous evening he had remained at work for the purpose of working on his pickup until 8:30 p.m., then he had gone to Bruce Kneifl's house for a few minutes, and then had driven to the Dairy Sweet to eat supper. The defendant also told Lutter that after he had eaten he went home around 9:30 and did not leave again that evening. Bruce Kneifl testified that he did not see the defendant on the night of November 1, 1989.

The victim's grandson and defendant's cousin, Jim Drinkwalter, testified that at a family gathering later in the week after the victim's murder, he noticed scratches across the back of the defendant's hand.

On November 13, 1989, in a search of the defendant's apartment, a throw rug and a trap from the defendant's lavatory were seized. Body fluid samples were also obtained from the defendant on this day, including blood and saliva samples.

Reena Roy, a forensic serologist with the Nebraska State Patrol, analyzed blood and saliva samples from the victim and from the defendant. Roy also analyzed trace evidence taken from the scene of the crime and from the defendant's apartment. Roy testified that she determined that the victim, Esther Drinkwalter, had type A blood and the defendant, Randy Drinkwalter, had type O blood. Roy analyzed a bloodstain taken from the rug taken from the defendant's apartment, which bloodstain was found to be type A and could have come from the murder victim. Roy also found type A blood in the sink trap taken from the defendant's apartment, which blood also could have come from the victim. After examining fingernail samples taken from the victim, Roy determined that six of the nails had blood type A under them, which was consistent with the victim's blood. Four of the fingernails had blood type O under them, which was consistent

with the defendant's blood type. The cigarette butts from the scene of the crime were also analyzed. Roy determined that approximately 35 percent of the Caucasian population, including the defendant, could have smoked the cigarettes.

Jeffrey Patterson, a criminalist with the Nebraska State Patrol, analyzed fragments of broken glass found at the scene of the murder. According to Patterson, measuring the refractive index is the best method for differentiating between the types of glass fragments. Patterson discovered four different refractive indices among five samples of broken glass. Five samples of glass fragments found in the rug taken from the defendant's apartment all had the same refractive index, which was similar to the refractive index of glass found at the scene of the crime. Patterson testified that he could not absolutely determine that the fragments in the rug were from glass found at the scene of the crime. He could only say that the refractive index was the same. The refractive index test establishes that two glass fragments may have common origins. The refractive index test is accepted by the scientific community as determining the distinguishing factors between small fragments of glass.

Randy Drinkwalter testified at the trial on his own behalf. The defendant testified that his apartment was furnished prior to his living there and that the rug taken during the search of his apartment was present in the apartment prior to the time he moved in. As to his whereabouts on the night of the murder, the defendant stated that he worked that evening until approximately 6 p.m. and then stayed at work after hours to work on his pickup. He testified that he did not go to Bruce Kneifl's that night. He left work at approximately 8:30 p.m. After going home to shower, he drove to the Dairy Sweet to eat, arriving between 9 and 9:20 p.m. He ordered a four-piece broasted chicken dinner that took 15 to 20 minutes to cook. The defendant testified that he got the dinner around 9:35 and ate all of it. The defendant left the Dairy Sweet between 9:45 and 10 p.m. and then drove back to his apartment, which was seven to eight blocks away. The last time the defendant had visited his grandmother, Esther Drinkwalter, was approximately 3 to 4 months prior to her death. The defendant stated that he never

visited his grandmother because he never found the time to go there.

Several patrons of the Dairy Sweet on November 1, 1989, testified as to the approximate time of the defendant's departure from the restaurant. The departure times ranged from 9:30 to 9:50 p.m.

The first two assignments of error pertain to two evidentiary rulings at trial which the defendant argues were prejudicial error and which therefore require that the judgment be reversed. The first alleged error pertains to testimony by the defendant's cousin and victim's grandson, Jim Drinkwalter, concerning a conversation he had with the victim on June 21, 1989. Jim Drinkwalter was asked at trial whether his grandmother had ever made a statement to him with regard to her feelings about the defendant, Randy Drinkwalter. Defense counsel objected to this question based on foundation, relevance, and hearsay. The trial court overruled the objection without comment and permitted the following testimony:

A. I asked her if Randy ever come over and visited her.

Q. And did she respond?

A. Yes.

Q. What did she say?

A. She says "No, and I'm glad, because he scares me," and then I come back and says, "He scares you?" and she says, "Yes."

It is clear that this testimony is hearsay under Neb. Rev. Stat. § 27-801 (Reissue 1989). The next consideration is whether the testimony was admissible under any recognized exception to the hearsay rule. It is not evident from the record what the trial court's basis for the admission of the statement was. It appears that the testimony was offered to prove the victim's state of mind, that is, her stated fear of the defendant. The state of mind exception to the hearsay rule allows the admission of extrajudicial statements to show the state of mind of the declarant if the state of mind of the declarant at the time the statement was made is an issue in the case. See, Neb. Rev. Stat. § 27-803(2) (Reissue 1989); *State v. Harrison*, 221 Neb. 521, 378 N.W.2d 199 (1985). Regardless of whether the statement in question would fit within Nebraska's state of mind exception to

the hearsay rule, it does not appear that the victim's alleged fear of the defendant at the time the statement was made is relevant to any issue in this case.

Under Neb. Rev. Stat. § 27-401 (Reissue 1989), relevant evidence means "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Further, under Neb. Rev. Stat. § 27-403 (Reissue 1989), "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury . . . or needless presentation of cumulative evidence."

In *United States v. Brown*, 490 F.2d 758 (D.C. Cir. 1973), the court discussed the dangers of a court's receiving hearsay evidence involving the victim's fears of the defendant. In determining whether a victim's prior statement of fear of the defendant would be admissible, the *Brown* court stated:

> First, the victim's state of mind must be relevant to some material issue in the case as, for example, where an issue of self-defense, suicide, or accidental death is raised by defendant. Second, the extrajudicial statement itself must be probative on that question of the victim's state of mind once it is conceded that this is a valid and relevant inquiry.

490 F.2d at 774. The *Brown* court also noted:

> The rule then to be distilled from the better reasoned decisions is that a victim's extra-judicial declarations of fear of the defendant are admissible under the state of mind exception to the hearsay rule . . . only if there is a manifest need for such evidence, *i. e.,* if it is relevant to a material issue in the case. Where there is a substantial likelihood of prejudice to the defendant's case in the admission of such testimony, it is inadmissible if it bears only a remote or artificial relationship to the legal or factual issues raised in the case. Even where there is substantial relevance, the additional factual matters in the statement may simply be too explosive to be contained by the limiting instruction, in which case exclusion of the testimony is also necessitated.

490 F.2d at 773-74.

In the present case it is clear that the victim's fear of the defendant was not relevant. The possibilities of suicide, self-defense, or accidental death were not at issue in this case. Further, even if the statement of fear were relevant, the statement was highly prejudicial to the defendant. It is reasonable to assume that there was a danger that the jury would infer from the victim's statement of fear of her grandson that the defendant had threatened his grandmother in the past or that he was a person capable of committing murder. Therefore, based on the lack of relevance and the highly prejudicial nature of the statement, it was error to overrule defense counsel's objections to this testimony.

The second assignment of error pertains to a statement made by one of the State's expert witnesses, Patterson, with regard to his opinions based on his analysis and comparison of glass fragments. Patterson tested and compared glass fragments taken from the scene of the crime and glass fragments found in a rug taken from the defendant's apartment. Patterson testified with regard to the process by which the "refractive index" of glass fragments is determined. Patterson also testified that this process "is reported to be the best way to distinguish between fragments of glass." When Patterson was asked his opinion with regard to the comparison of glass fragments found at the scene of the crime and glass fragments found in the rug taken from the defendant's apartment, he testified that the refractive indices of the five fragments of glass taken from the rug were identical and matched the refractive index of one of the samples taken from the scene of the crime. Patterson testified that he could not determine absolutely that the fragments recovered from the rug were from glass found at the scene of the crime. He stated that he could testify only that the refractive indices of the fragments were the same and that the glass found in the rug was similar to glass found at the scene of the crime. The alleged error pertains to the following question and answer made at the end of Patterson's direct testimony: "Q. And the rug itself contained glass alone, which was from the scene of the crime? A. Yes."

Defense counsel objected after this statement was made, on the grounds of improper foundation or relevance. Defense

counsel then moved to strike the response. The trial court overruled this objection, stating that the motion was too late.

The defendant argues that the statement was prejudicial error, as it left the jury with the impression that the rug conclusively contained glass fragments which had originated at the scene of the crime. Based on Patterson's previous testimony that he could not determine absolutely that the fragments recovered from the rug were from glass found at the scene of the crime, the trial court should have sustained defense counsel's motion to strike the answer to the leading question that the rug contained glass "alone" from the scene of the crime.

In a jury trial of a criminal case, an erroneous evidential ruling results in prejudice to a defendant unless the State demonstrates that the error was harmless beyond a reasonable doubt. *State v. Messersmith*, 238 Neb. 924, 473 N.W.2d 83 (1991); *State v. Coleman*, 239 Neb. 800, 478 N.W.2d 349 (1992).

We cannot determine how the jury in this case would have evaluated the remaining evidence if it had not been told that the victim was afraid of the defendant. Likewise, we cannot determine the effect on the jury of the expert's affirmative answer to the leading question that the rug in the defendant's apartment contained glass "alone" from the scene of the crime. This is true largely because the evidence presented to the jury, and upon which a conviction was based, was almost entirely circumstantial. Accordingly, we are unable to say that the error in the admission of the improper testimony was harmless beyond a reasonable doubt.

The defendant's next assignments of error pertain to a statement made by the trial court during its preliminary instruction to the jury at the commencement of the trial and to the trial court's definitions of "premeditation" and "reasonable doubt" given to the jury both at the commencement of the trial and during the trial court's final instructions to the jury.

During the trial judge's pretrial statement to the jury, the judge stated in relevant part:

> Ladies and gentlemen, at this time I want to give you a little bit of orientation about the trial. It might help you perform your function. You are here to decide disputed

issues of fact. Now, your decision on any disputed fact is final. Perhaps it would be easier for you to understand your function as jurors if you understood my function as a judge. The judge has three functions: One is he is sort of a referee between the parties. In that function the judge rules on the evidence and objections that might be made, and in so doing he attempts to see that recognized practices and procedures are followed, and that the proceedings between the parties are fair. Secondly, a judge must decide what the law is that is applicable to that particular case, and lastly, he must instruct the jury as to what that law is.

Now when somebody pleads innocent to a crime, all facts are in issue. All facts are disputed. The defendant is presumed innocent, and the statute — the State will introduce evidence, and the defendant will introduce such evidence as he chooses. I will instruct you as to the facts the State must prove beyond a reasonable doubt to find the defendant guilty of crimes charged. You will then decide whether the State has proved the material facts — the material elements of the crime beyond a reasonable doubt, and render your decision accordingly. Your decision is final.

Now, in a criminal case the judge determines only whether or not there is enough evidence to support a verdict, and instructs the jury on the law. The determination of guilt or innocence is then upon the jury.

The defendant argues that the trial judge's statement that "in a criminal case the judge determines only whether or not there is enough evidence to support a verdict" was prejudicial error.

The defendant argues that this comment was improper in that the statement left the jury with the impression that if a verdict form of guilty of murder in the first degree is submitted to the jury, then, and in that event, the judge is of the opinion that there is enough evidence to support such a verdict.

Neb. Rev. Stat. § 29-2016 (Reissue 1989), which provides for the order of procedure for a criminal trial, does not require that a preliminary instruction be given to the jury. However, even though a preliminary jury instruction is not required, such

instructions have become commonplace, and the Proposed Nebraska Criminal Jury Instructions recommends that a preliminary jury instruction be given. The recommended preliminary jury instruction proposed in the Nebraska Criminal Jury Instructions does not contain a statement similar to the one which was used by the trial court in this case, that "in a criminal case the judge determines only whether or not there is enough evidence to support a verdict . . . ."

In *Hansen v. State*, 141 Neb. 278, 286, 3 N.W.2d 441, 446 (1942), this court stated:

As a general rule, "It is the duty of the court to abstain carefully from any expression of opinion or comment on the facts or evidence, not only in its charge to the jury * * * but also on the examination of witnesses and otherwise during the course of the trial. The trial judge should not deny the existence of any fact bearing on the innocence of accused, or make any remark or inquiry in the presence of the jury concerning matters of fact at issue which indicates his opinion as to such facts."

Quoting 23 C.J.S. *Criminal Law* § 993 (1940).

With the exception of the erroneous admission or exclusion of evidence, a defendant claiming reversible error in a criminal case must demonstrate that the trial court's conduct during the proceeding against the defendant prejudiced or otherwise adversely affected a substantial right of the defendant. *State v. Messersmith*, 238 Neb. 924, 473 N.W.2d 83 (1991). It appears that the statement of the trial court in its preliminary instruction to the jury at the commencement of the trial may have had the effect of indicating to the jury that if a verdict form of guilty of murder in the first degree is submitted to the jury, the judge is of the opinion that there is enough evidence to support such a verdict. Accordingly, the statement by the trial court was prejudicial to the defendant and is reversible error.

The defendant also argues that the trial court erred in giving the jury instruction with regard to the definition of premeditation. However, no objection was made to this instruction prior to its being read to the jury. Failure to object to an instruction after it has been submitted to counsel for review will preclude raising an objection on appeal absent plain error

indicative of a probable miscarriage of justice. *State v. Lohman*, 237 Neb. 503, 466 N.W.2d 534 (1991).

Regardless of whether this assignment of error was properly preserved for appellate review, the "premeditation" definition appears to be sound. The trial court in this case defined "premeditation" as follows: " 'Premeditation' is defined as forming the intent to act before acting. The time needed for premeditation may be so short as to be instantaneous provided that the intent to act is formed before the act and not simultaneous with the act." In *State v. Batiste*, 231 Neb. 481, 491, 437 N.W.2d 125, 132 (1989), this court stated:

"Premeditated" means to have formed a design to commit an act before it is done. See Neb. Rev. Stat. § 28-302 (Reissue 1985). A person kills with "premeditated malice" if before the act causing the death occurs, he or she has formed the intent or determined to kill the victim without legal justification.

The *Batiste* court further stated:

"The question of premeditation was for the jury to determine. *State v. Jones*, 217 Neb. 435, 350 N.W.2d 11 (1984). No particular length of time for premeditation is required, provided that the intent to kill is formed before the act is committed and not simultaneously with the act that caused the death. *Jones, supra*; *State v. Nokes*, 192 Neb. 844, 224 N.W.2d 776 (1975); *Savary v. State*, 62 Neb. 166, 87 N.W. 34 (1901). The time needed for premeditation may be so short as to be instantaneous; the intent to kill may be formed at any moment before the homicide is committed. *State v. Bautista*, 193 Neb. 476, 227 N.W.2d 835 (1975); *Nokes, supra*."

231 Neb. at 492, 437 N.W.2d at 132, quoting *State v. Benzel*, 220 Neb. 466, 370 N.W.2d 501 (1985). Accordingly, the premeditation instruction was sound, and this assignment of error is without merit.

The defendant also argues that the reasonable doubt instruction given in this case was improper in light of the U.S. Supreme Court's decision in *Cage v. Louisiana*, 498 U.S. 39, 111 S. Ct. 328, 112 L. Ed. 2d 339 (1990). This issue has previously been resolved by this court in *State v. Morley*, 239

Neb. 141, 474 N.W.2d 660 (1991). This court recently reaffirmed the *Morley* holding in *State v. Lewis*, 241 Neb. 334, 488 N.W.2d 518 (1992). In *Morley*, this court determined that a reasonable doubt instruction nearly identical to the instruction given in this case complied with the *Cage* decision. Accordingly, this assignment of error is also without merit.

In view of the conclusions which we have reached in regard to the assignments of error which have been discussed, it is unnecessary to consider any of the other assignments of error made by the defendant, including those relating to the sentence.

The judgment is reversed and the cause remanded for a new trial.

REVERSED AND REMANDED FOR A NEW TRIAL.

BOSLAUGH, J., dissenting in part.

I dissent only from that part of the opinion that holds that the statement of the trial court to the jury at the commencement of the trial that in a criminal case the judge determines only whether or not there is enough evidence to support a verdict was erroneous and prejudicial.

It would seem to be quite obvious that if at the end of the trial the court submits verdict forms to the jury before they retire to deliberate, including both guilty and not guilty forms, the court has determined that the evidence of the State, if believed, is sufficient to support a verdict of guilty.

The instructions to the jury which were given in this case at the end of the trial were in the usual form and advised the jury that if it found from the evidence presented that the State had proved beyond a reasonable doubt all of the elements of the crimes charged, which were set out in the instructions, it should find the defendant guilty. It seems to me that is but another way in which the court tells the jury that the court has determined that the evidence of the State is sufficient, if believed, to support a verdict of guilty.

In my opinion, the statement made in the preliminary instruction was neither erroneous nor prejudicial.