STATE OF NEBRASKA, APPELLEE,
v. RICHARD A. LARSEN, APPELLANT.
586 N.W. 2d 641

Filed November 6, 1998.    No. S-96-1188.

Richard J. Epstein for appellant.

Don Stenberg, Attorney General, and Kimberly A. Klein for appellee.

WHITE, C.J., CAPORALE, WRIGHT, CONNOLLY, GERRARD, STEPHAN, and MCCORMACK, JJ.

GERRARD, J.

Pursuant to jury verdict, the defendant-appellant, Richard A. Larsen, was adjudged guilty by the district court of two counts of murder in the first degree, in violation of Neb. Rev. Stat. § 28-303 (Reissue 1995), and two counts of use of a deadly weapon in the commission of a felony, in violation of Neb. Rev. Stat. § 28-1205 (Reissue 1995). Larsen was sentenced to life imprisonment for each murder conviction and to 15 to 20 years' imprisonment for each conviction of use of a weapon in the commission of a felony. The life sentence for the murder of victim Louis Clinchers was ordered to be served consecutively to the life sentence for the murder of victim Shawn Nelson. The sentences of 15 to 20 years' imprisonment for each of the use of a weapon convictions are to be served consecutively to the respective murder convictions, pursuant to § 28-1205(3). Larsen timely appealed. For the reasons that follow, we determine that each of Larsen's assigned errors is without merit and affirm the judgment of the district court.

## FACTUAL BACKGROUND

On September 24, 1995, Lamont Arnold was involved in an altercation with victims Nelson and Clinchers, and as a result, Arnold sustained a cut to his face. Later that day, Arnold attended a party at the Park Avenue Apartments, where he complained to others that he had been "jumped" by some people. Arnold left the party with another person to go and find Clinchers, and once they found Clinchers, one of the individuals hit Clinchers on the head with a brick. Arnold thereafter returned to the party and bragged to others that he had "bricked" Clinchers. Larsen was described as being upset after being informed that Arnold had been attacked by two men, and Larsen suggested that they "go finish [Clinchers] off." Therefore, Jeffrey Briney, Arnold, and Larsen went back to the location where Clinchers lay.

Briney testified that as the three approached Clinchers, Clinchers was trying to speak. Briney testified that he then kicked Clinchers in the stomach and back and that moments later, Larsen pulled out a knife and stabbed Clinchers repeatedly. While Larsen was in the process of stabbing Clinchers, a car drove through the alley, causing Larsen, Arnold, and Briney to leave Clinchers and to go hide on some stairs. After the car passed, Arnold went back up the stairs and rummaged through Clinchers' pockets. Briney testified that because Clinchers was still mumbling, Larsen stabbed him again. Clinchers died as a result of the attack.

After returning to the party at the Park Avenue Apartments, Larsen and Arnold told Briney and Rio Jason Landers that they were going for a walk. All four men proceeded to the Canterbury Apartments, where Nelson lived. Briney testified that upon arriving at the apartments, Larsen and Arnold had a discussion regarding who was going to stab Nelson. Briney testified that in order to enter Nelson's apartment, Arnold used the same knife that Larsen had used in stabbing Clinchers to pry open a window to the apartment. Once inside the apartment, Arnold sprayed Mace and fought with Nelson in the kitchen area, while Briney attacked another person in the living room area. After Arnold stabbed Nelson, he fled the apartment, followed by Briney, Landers, and Larsen. However, according to

Briney, as Larsen reached the top of the stairs of the apartment complex, he stopped, picked up a 2 by 4 piece of wood, and went back into the apartment.

Larsen told the police that after leaving Nelson's apartment, he and Arnold hid the knife in a tire in the backyard of the Park Avenue Apartments. The next day, Larsen and Landers told Jennifer Grabenschroer and Theresa Newberry to retrieve the knife from its hiding place and to bring it to them so that they could dispose of the knife at Larsen's parents' farm in Wahoo. Larsen told the police that he and Landers hid the knife on his parents' place and that they thought about taking his parents' car in order to run away. Eventually, however, Larsen and Landers decided to return to Omaha, where Larsen was arrested. Larsen accompanied the police to his parents' place in Wahoo and assisted them in finding the knife that was used in the murders.

Grabenschroer and Newberry testified that they witnessed Arnold complaining to others about getting jumped by some men and receiving a cut to his face. The two witnesses described Larsen as angry and "pumped up" to go fight the men who jumped Arnold. Grabenschroer testified that later that night, she saw Larsen with a bloody knife in his hand, and that Larsen told her that he had killed someone. Newberry also testified that Larsen told her that Arnold had "bricked" the man that jumped him and that Larsen had stabbed the man. Larsen told Newberry that they had to cover up what they had done by getting the other man, Nelson, who knew that Arnold had been attacked. Grabenschroer and Newberry further testified that Larsen told them that he, along with Arnold, Briney, and Landers, climbed through Nelson's apartment window and that Arnold sprayed Mace around the place. Larsen also told Grabenschroer and Newberry that he hit someone who was present in the apartment with a 2 by 4 piece of wood.

At trial, Larsen raised the defense of insanity. Dr. Bruce Gutnik, a psychiatrist who examined Larsen 5 months after the killings, testified in behalf of Larsen. Gutnik testified that prior to his examination of Larsen, he reviewed Larsen's hospitalization records and one summary police report regarding the deaths of Clinchers and Nelson. Based on the review of those records and a psychiatric evaluation of Larsen, Gutnik opined

that Larsen was suffering from paranoid schizophrenia and did not know right from wrong on the date that Clinchers and Nelson were murdered.

To rebut Gutnik's testimony, the State called Dr. Mario Scalora of the Lincoln Regional Center. Scalora testified that prior to interviewing Larsen, he reviewed Larsen's hospital records, police reports, and statements made by Larsen and other witnesses to the police. In addition, Scalora testified to the results of four psychological tests administered to Larsen to measure his current level of personality and intellectual functioning. Based on his review of the records and the psychiatric examination, Scalora opined that Larsen knew right from wrong at the time that Clinchers and Nelson were murdered.

After Scalora's testimony, the case was submitted to the jury. On August 2, 1996, the jury returned a verdict convicting Larsen of two counts of first degree murder and two counts of use of a weapon in the commission of a felony, and judgment was entered accordingly. Larsen filed a motion for new trial, which was subsequently overruled by the district court. Thereafter, Larsen was sentenced to life imprisonment for each murder conviction and to 15 to 20 years' imprisonment for each use of a weapon conviction, the sentences to be served consecutively. Larsen appealed the judgment, and his appeal was docketed directly in this court as provided by Neb. Rev. Stat. § 24-1106 (Reissue 1995).

## STANDARD OF REVIEW

On review, a criminal conviction must be sustained if the evidence, viewed and construed most favorably to the State, is sufficient to support the conviction. In determining whether the evidence is sufficient to sustain a conviction in a jury trial, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, evaluate explanations, or reweigh the evidence presented to the jury, which are within the jury's province for disposition. *State v. Arnold*, 253 Neb. 789, 572 N.W.2d 74 (1998); *State v. Becerra*, 253 Neb. 653, 573 N.W.2d 397 (1998).

## ASSIGNMENTS OF ERROR

Larsen assigns eight errors, which may be consolidated into the following five: (1) The trial court erred in overruling his motion to suppress the statement that he gave to the police; (2) the trial court erred in overruling his motion to exclude expert witness evidence or to grant a continuance and in overruling his motion for new trial because the expert witness evidence was admitted at trial; (3) the trial court erred in admitting into evidence, over objection, a codefendant's guilty plea; (4) the trial court erred in overruling his motion for mistrial; and (5) the verdict is not sustained by the evidence and is contrary to law.

## ANALYSIS

We supply with the analysis of each assignment of error such additional facts and standards of review as are relevant thereto.

### MOTION TO SUPPRESS

Larsen argues in his first assignment of error that the trial court erred in overruling his motion to suppress the statement he made to the police, because Larsen was improperly induced into waiving his right to counsel and making the statement, thereby rendering the statement involuntary. Larsen claims that after he invoked his right to counsel, someone in the Omaha Police Division told him that other parties were blaming him for the homicides, which, according to Larsen, was the impetus for giving a statement to the police without the assistance of counsel.

The evidence adduced at the suppression hearing revealed that shortly after Larsen was arrested, an Omaha police officer advised Larsen of his constitutional rights, including his right to counsel. At that time, Larsen refused to make a statement without first speaking to an attorney. However, the next day, Sgt. John Skanes of the Omaha Police Division was informed by jail personnel that Larsen wanted to speak with a homicide investigator because he had found out that others were incriminating him in the murders. Therefore, Det. Dean Thorsen of the Omaha Police Division went to the jail and asked Larsen if it was true that he wanted to speak with a homicide investigator, and Larsen replied that it was. Thorsen testified that to the best of his knowledge, no police officer had contacted Larsen after

he invoked his right to counsel. Thorsen further testified that he did not know how Larsen found out that other people were incriminating him, but that it was true.

Prior to taking any kind of statement from Larsen, Thorsen readvised Larsen of his constitutional rights, including the right to counsel, and Larsen told Thorsen that he agreed to make a statement without the assistance of counsel. In his statement, Larsen stated that it was his own idea to contact the police to make a statement. Thorsen's testimony was the only evidence adduced at the suppression hearing.

The voluntariness of a statement is to be tested by looking at all the circumstances, and the finding of the trial court will not be set aside unless clearly erroneous. *State v. Nissen,* 252 Neb. 51, 560 N.W.2d 157 (1997). In making this determination, an appellate court does not reweigh the evidence or resolve conflicts in the evidence, but, rather, recognizes the trial court as the finder of fact and takes into consideration that it observed the witnesses. *Id.*

Following the lead of the U.S. Supreme Court, in *State v. Smith,* 242 Neb. 296, 301-02, 494 N.W.2d 558, 563 (1993), we adopted the following rule governing subsequent waivers of an accused's invoked right to counsel: " '[A]n accused . . . having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, *unless the accused himself initiates further communication, exchanges, or conversations with the police.*' " (Emphasis in original.) (Quoting *Edwards v. Arizona,* 451 U.S. 477, 101 S. Ct. 1880, 68 L. Ed. 2d 378 (1981).)

In *State v. Smith, supra,* the defendant, after being arrested and advised of his *Miranda* rights, invoked his right to counsel. Thus, at that point in time, police questioning of the defendant terminated. However, upon transporting the defendant to the jailhouse, a police officer told the defendant that she " 'would be there for a little while' '[i]f he wanted to talk.' " *Id.* at 301, 494 N.W.2d at 562. Shortly thereafter, the defendant asked to speak to that officer and subsequently gave a confession. The issue in *State v. Smith* was whether the defendant initiated the conversation during which he confessed or whether the officer

initiated the conversation between the defendant and her, and thus, whether the confession had to be suppressed in accordance with the foregoing rule on subsequent waivers of an accused's invoked right to counsel.

In holding that the defendant validly waived his right to counsel and, thus, that suppression of the confession was not warranted, we stated that "there can be no doubt in this case that when defendant asked to speak to [the officer], he ' "initiated" further conversation in the ordinary dictionary sense of that word.' " *Id.* at 303, 494 N.W.2d at 563 (quoting *Oregon v. Bradshaw*, 462 U.S. 1039, 103 S. Ct. 2830, 77 L. Ed. 2d 405 (1983)). We further stated that the

> [d]efendant's request "evinced a willingness and a desire for a generalized discussion about the investigation; it was not merely a necessary inquiry arising out of the incidents of the custodial relationship." *Oregon v. Bradshaw*, 462 U.S. at 1045-46. The fact that [the officer] had told defendant that she would be around for a little while prior to defendant's request does not negate the fact that defendant initiated the dialog. [The officer's] statement was not intended to start a conversation, but merely informed defendant that she would be available if he wished to initiate a dialog.

*State v. Smith*, 242 Neb. at 303, 494 N.W.2d at 563-64.

In the instant case, as in *State v. Smith*, our inquiry is limited to determining whether Larsen initiated the conversation during which he confessed or whether Thorsen, or some other officer, initiated the interaction between Larsen and Thorsen, in violation of *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), and its progeny. Unlike in *State v. Smith, supra*, where there was a question as to whether the officer initiated further conversation with the defendant when she told the defendant she would be around for a little while if he wanted to talk, in the case at bar, there is not a scintilla of evidence that an officer ever made any statement to Larsen after he invoked his right to counsel and prior to his request to speak to an officer. Nonetheless, Larsen contends in his brief that "someone in the law enforcement setting must have advised [Larsen] that other parties were blaming him for the homicides." Brief for appel-

lant at 35. However, the only evidence adduced at the suppression hearing and in the record suggests that it was Larsen who, in fact, freely initiated contact with the police in order to make a statement. Larsen himself admitted in his statement to the police that it was his idea to contact the police after invoking his right to counsel.

Therefore, in accordance with the rule set forth in *State v. Smith*, 242 Neb. 296, 494 N.W.2d 558 (1993), because the record shows that it was Larsen himself who initiated further communication with the police without any inducement by a police officer, Larsen validly waived his right to counsel. Accordingly, we determine that the trial court did not clearly err in finding that Larsen gave a voluntary statement to the police and in overruling Larsen's motion to suppress.

### EXPERT WITNESS EVIDENCE

Next, Larsen contends that the trial court erred in not granting a continuance or excluding the expert witness testimony of Scalora. Larsen asserts that the evidence should have been excluded on the grounds that the State failed to comply with Neb. Rev. Stat. § 29-2203 (Reissue 1995) and the Douglas County District Court rule on pretrial motions, Fourth Jud. Dist. R. of Proc. 4-2(B) (rev. 1995). Larsen argues that his counsel was not given notice, as required by § 29-2203 and rule 4-2(B), prior to the entry of an ex parte order by the district court requiring Larsen to be transferred to the Lincoln Regional Center for an evaluation by Scalora.

Section 29-2203 provides that if a criminal defendant intends to plead not guilty by reason of insanity, he or she may not offer evidence for the purpose of establishing his or her insanity unless notice of intention to rely upon the insanity defense is provided to the State and filed with the court no later than 60 days prior to trial. Section 29-2203 further provides, in pertinent part:

> Upon the filing of the notice the court, on motion of the state, may order the defendant to be examined at a time and place designated in the order, by one or more qualified experts, appointed by the court, to inquire into the sanity or insanity of the defendant at the time of the commission

of the alleged offense. . . . The presence of counsel at the examination shall be within the discretion of the court. The results of such examination shall be sent to the court and to the prosecuting attorney. . . . In the interest of justice and good cause shown the court may waive the requirements provided in this section.

Although rule 4-2(B) was not made a part of the record on appeal, we note that the Douglas County District Court rules are on file with this court, and thus, we will take judicial notice of rule 4-2(B). This rule provides, in relevant part, that "[u]nless otherwise ordered by the court, all pretrial . . . motions . . . which require a hearing shall be filed in the case prior to the scheduled hearing." Rule 4-2(B) further provides that "[t]imely notice of said hearing shall be personally delivered or mailed to the opposing party."

On May 23, 1996, Larsen filed his notice of intention to rely upon the insanity defense, and on June 14, Larsen provided the State with copies of Gutnik's psychiatric evaluation. Along with the evaluation, Larsen's attorney sent a letter requesting that in the event the State was intending to hire an expert witness, it should notify him prior to such examination, as he wanted to be present at Larsen's psychiatric examination. However, without giving notice to Larsen's attorney, the State, pursuant to an oral motion, obtained an ex parte order from the district court requiring Larsen to be sent to the Lincoln Regional Center for an evaluation by Scalora.

It is implicit in § 29-2203 that defense counsel be notified that the defendant is to be examined and be given an opportunity to be heard. Otherwise, defense counsel would be unable to make any argument to the court as to why he or she should be present at the examination, rendering the court's discretion as to whether defense counsel should be present unguided. Furthermore, rule 4-2(B) explicitly requires that a motion be filed when a hearing is required. Thus, the district court erred in sustaining the prosecution's ex parte oral motion. However, we conclude that the district court did not err in overruling Larsen's motion to exclude the expert witness evidence on the basis that the State did not comply with § 29-2203 and rule 4-2(B). As the subsequent discussion illustrates, the failure to comply was

harmless beyond a reasonable doubt, as Larsen's defense counsel was given adequate opportunities to depose Scalora and received a copy of Scalora's report as soon as the State received the report.

Nevertheless, on July 25, 1996, at the same hearing in which the court denied Larsen's motion to exclude expert evidence, Larsen's attorney also requested a continuance so that he could have sufficient time to review Scalora's report prior to the trial that was scheduled to commence on July 29. During the hearing, the State noted that it probably would not receive a written report from Scalora until July 26, but that on July 23 it offered Larsen's counsel an opportunity to depose Scalora. Following the hearing, the trial court overruled Larsen's motion for a continuance. However, the trial court afforded Larsen's counsel an opportunity to depose Scalora on either July 26 or July 27. The trial court further entered an order requiring that all medical records and reports generated by the Lincoln Regional Center regarding Larsen's examination, which concluded on July 25, be furnished to the State by July 26.

On July 26, 1996, the State faxed certain medical records from the Lincoln Regional Center to Larsen's counsel; however, Scalora's report was not among those documents, as it had not yet been generated. Therefore, Larsen renewed his motions to exclude Scalora's testimony and, in the alternative, for a continuance. The trial court overruled Larsen's renewed motions, but directed the State either to initiate a joint telephone call to Scalora so that both parties' counsel could talk to Scalora and find out what they needed to know in preparation for trial, or to have Scalora come to Douglas County the night before he was to testify so that both parties' counsel could depose him. In accordance with the court's directive, both parties' counsel on July 29 had a 40-minute conversation with Scalora.

Despite the fact that Larsen's counsel had a lengthy conversation with Scalora, Larsen again renewed his motions on July 29 to exclude Scalora's testimony and for a continuance. In overruling Larsen's renewed motions, the trial court determined that Larsen would not suffer any prejudice, because both parties' counsel were laboring under the same disadvantage, as neither counsel had yet received a physical copy of Scalora's

report. Nonetheless, the trial court afforded Larsen's counsel another opportunity to depose Scalora prior to Scalora's testifying at trial.

On July 30, 1996, Scalora's report was faxed to the State, and on that same day, the State photocopied and delivered the report to Larsen's counsel. By this time, the trial had already commenced. Scalora testified at trial on August 2.

After the jury returned its verdict, Larsen filed a motion for new trial, contending, inter alia, that he suffered prejudice from the admission of Scalora's testimony into evidence. In support of his motion, Larsen claimed that he attempted to employ two psychologists from the area to review Scalora's report, but that he was unsuccessful, as both psychologists avowed in affidavits that they did not have time to review Larsen's psychological test results that were included within Scalora's report during the week of July 29, 1996. The district court overruled Larsen's motion for new trial.

In the instant case, since the State made Scalora's report available to Larsen as soon as the State received it, there is certainly no evidence of prosecutorial misconduct. Therefore, the sole issue we must determine on appeal is whether Larsen was prejudiced by the trial court's failure to exclude the expert witness evidence, to grant a continuance, or to grant a new trial when Larsen did not receive Scalora's report until the trial had already commenced.

The decisions whether to exclude expert witness testimony and to grant a continuance in a criminal case are within the discretion of the trial court and will not be disturbed on appeal absent an abuse of discretion. *State v. Buechler*, 253 Neb. 727, 572 N.W.2d 65 (1998) (expert witness); *State v. Turner*, 252 Neb. 620, 564 N.W.2d 231 (1997) (continuance); *State v. Kula*, 252 Neb. 471, 562 N.W.2d 717 (1997) (continuance); *State v. Thieszen*, 252 Neb. 208, 560 N.W.2d 800 (1997) (expert witness). In addition, in a criminal case, a motion for new trial is addressed to the discretion of the trial court, and unless an abuse of discretion is shown, the trial court's determination will not be disturbed. *State v. Jacob*, 253 Neb. 950, 574 N.W.2d 117 (1998); *State v. Kula, supra.*

Neb. Rev. Stat. § 29-1912 (Reissue 1995) provides the procedure for discovery in criminal cases. *State v. Null,* 247 Neb. 192, 526 N.W.2d 220 (1995). Under § 29-1912, whether a prosecutor's late disclosure of evidence results in prejudice depends on whether the information sought is material to the preparation of the defense, meaning that there is a strong indication that such information will play an important role in uncovering admissible evidence, aiding preparation of witnesses, corroborating testimony, or assisting impeachment or rebuttal. See *State v. Kula, supra.*

In the instant case, Larsen claims that he was unsuccessful in employing a psychologist to review Scalora's report during the week of July 29, 1996. However, Larsen's claim is not well founded, since Gutnik, Larsen's own expert witness at trial, testified on direct examination that he reviewed the reports generated by the Lincoln Regional Center. Therefore, the evidence supports the conclusion that Gutnik was available during the week of July 29 to assist Larsen in analyzing any reports, including Scalora's, generated by the Lincoln Regional Center.

Moreover, while recognizing that the delay in receiving Scalora's report until the trial had commenced posed a heavy burden on Larsen's counsel, we do not conclude that such delay rose to the level of prejudicial error. Any prejudice that Larsen may have suffered as a result of the delay was cured by the fact that the State and the trial court made every opportunity available to Larsen to depose Scalora prior to the commencement of trial. Indeed, on July 23 and July 25, 1996, the State and the trial court afforded Larsen opportunities to depose Scalora. In addition, on July 29, the trial court directed the State either to initiate a joint telephone call to Scalora or to have Scalora come to Douglas County the night before he was to testify so that both parties' counsel could depose him. The record shows that on July 29, Larsen's counsel did have a 40-minute conversation with Scalora. We determine that since Larsen was given ample opportunity to depose Scalora prior to Scalora's testifying at trial on August 2 and did, in fact, have a 40-minute conversation with Scalora, Larsen was not prejudiced by the late disclosure of Scalora's report. Accordingly, it was not an abuse of discretion for the trial court to overrule Larsen's motion for exclusion

of Scalora's testimony, motion for a continuance, or motion for new trial.

## GUILTY PLEA EVIDENCE

In his next assignment of error, Larsen, by relying on *State v. Robertson*, 219 Neb. 782, 366 N.W.2d 429 (1985), argues that the trial court erred in admitting evidence of a guilty plea made by his codefendant Briney to charges arising out of his participation in the murders of Clinchers and Nelson. The record shows that during the State's direct examination of Briney, after Briney had already detailed his participation in the murders, the prosecutor asked Briney whether, since agreeing to testify on behalf of the State, he had pleaded guilty in juvenile court to being an accessory after the fact for his part in the same crimes for which Larsen was being tried. Over Larsen's objection, Briney replied in the affirmative.

In *State v. Robertson, supra,* we held that evidence of a codefendant's conviction was inadmissible and denied the defendant her right to a fair trial. However, we observed, in *State v. Lotter, ante* p. 456, 586 N.W.2d 591 (1998), that our holding in *State v. Robertson, supra,* relied primarily on the lack of relevance of a codefendant's conviction to the defendant's guilt and held that "to the extent that *Robertson* and *State v. Greeno,* 230 Neb. 568, 432 N.W.2d 547 (1988), indicate that evidence of a codefendant's guilty plea or conviction lacks relevance regardless of the purpose for which it is offered, they are hereby overruled." *State v. Lotter, ante* at 507, 586 N.W.2d at 627. In so holding, we stated that whether a codefendant's guilty plea is admissible evidence turns upon whether it was properly offered to help the jury assess the codefendant's credibility or was improperly offered as substantive evidence of the defendant's guilt. Generally, evidence that another person has been convicted of the same crime for which the defendant is on trial is not admissible as proof of the guilt of the defendant. *Id.* The same evidence, however, may be admissible for other reasons. For instance, under proper instruction, evidence of a codefendant's guilty plea or conviction may be elicited by the prosecutor on direct examination so that the jury may assess the credibility of the witness that the government asks it to believe. *Id.* (citing

*United States v. Halbert*, 640 F.2d 1000 (9th Cir. 1981)). In *State v. Lotter*, we concluded that because the prosecutor did not emphasize the plea agreement on direct examination of the codefendant, it was not improper for the prosecution to briefly offer evidence of a codefendant's guilty plea so long as it was relevant to the codefendant's credibility at trial.

As in *State v. Lotter, supra*, because the prosecutor in her direct examination of Briney did not emphasize the guilty plea and offered the same only after Briney had extensively detailed his participation in the murders, we are persuaded that the prosecution in the instant case was also attempting to blunt a predictable effort by the defense to impeach Briney's credibility with the plea agreement. Therefore, we determine that the evidence of Briney's guilty plea was offered for a legitimate, relevant purpose, that is, as evidence of Briney's credibility and not as substantive evidence of Larsen's guilt. Accordingly, the trial court did not err in admitting such evidence.

Nonetheless, because evidence of a codefendant's guilty plea is amenable to misuse, we held in *State v. Lotter, supra*, that even when such evidence is admissible, a curative instruction is required when requested by the defendant's counsel. Normally, the danger of misuse of a codefendant's guilty plea may be averted by adequate cautionary instructions that make it clear to laypeople that evidence of a witness' own guilty plea can be used only to assess credibility. See *United States v. Halbert, supra*. No curative instruction was given to the jury in *State v. Lotter, supra*; however, because the defense counsel did not ask the court to give such an instruction or object to the absence of such an instruction, we concluded that the defendant could not complain on appeal about incomplete instructions. In the instant case also, a curative instruction was not given to the jury. However, as in *State v. Lotter*, because the record shows that Larsen did not request a curative instruction or object to the absence of such an instruction, Larsen is now precluded from complaining on appeal about incomplete jury instructions. See, also, *Wallace v. Lockhart*, 701 F.2d 719 (8th Cir. 1983), *cert. denied* 464 U.S. 934, 104 S. Ct. 340, 78 L. Ed. 2d 308. Accordingly, this assignment of error is without merit and not grounds for a reversal.

## MOTION FOR MISTRIAL

In his fourth assignment of error, Larsen argues that the trial court erred in overruling his motion for mistrial because the State was responsible for the appearance before the jury of its in-custody witness, Briney, while he was restrained in leg irons. Larsen claims that this constituted prejudicial prosecutorial misconduct because his argument throughout the trial had been that Briney was receiving minimal punishment for his participation in the murders and that by allowing Briney to appear before the jury in leg irons, it sent the opposite signal, that Briney was receiving severe punishment.

The decision whether to grant a motion for mistrial is within the discretion of the trial court and will be upheld on appeal absent a showing of abuse of discretion. *State v. Jacob*, 253 Neb. 950, 574 N.W.2d 117 (1998); *State v. Anderson*, 252 Neb. 675, 564 N.W.2d 581 (1997). Before it is necessary to grant a mistrial for prosecutorial misconduct, the defendant must show that a substantial miscarriage of justice actually occurred. *State v. McHenry*, 247 Neb. 167, 525 N.W.2d 620 (1995); *State v. Bronson*, 242 Neb. 931, 496 N.W.2d 882 (1993). Whether prosecutorial misconduct is prejudicial depends largely on the facts of each case. *State v. Trackwell*, 244 Neb. 925, 509 N.W.2d 638 (1994), *disapproved on other grounds, State v. Koperski*, 254 Neb. 624, 578 N.W.2d 837 (1998); *State v. Swillie*, 240 Neb. 740, 484 N.W.2d 93 (1992).

In the present case, the facts do not support a finding of prosecutorial misconduct, because the evidence adduced at the hearing on Larsen's motion for mistrial demonstrated that the prosecutor was not responsible for Briney's appearing before the jury in leg irons. Capt. James Wintle of the Douglas County Sheriff's Department testified that it is the department's policy that all in-custody witnesses be brought into the courtroom in leg irons, unless the judge contacts the department and requests that the restraints be removed. No evidence was adduced of any direct or indirect involvement by the prosecutor in the decision to secure the in-custody witness, Briney, in leg restraints during his appearance before the jury. In the absence of such evidence, we find no prosecutorial misconduct and conclude that the trial

court did not abuse its discretion in overruling Larsen's motion for mistrial.

## INSUFFICIENCY OF EVIDENCE

In his last assignment of error, Larsen argues that there was insufficient evidence to convict him of first degree murder of Clinchers, as the evidence did not reflect that Larsen stabbed Clinchers with premeditated malice. Larsen further argues that there was insufficient evidence to convict him of first degree murder of Nelson because the evidence did not reflect that he aided and abetted Arnold in Nelson's murder; rather, according to Larsen, the evidence demonstrated that he was a mere bystander.

In reviewing a criminal conviction, an appellate court does not resolve conflicts in the evidence, pass on the credibility of the witnesses, or reweigh the evidence; such matters are for the finder of fact, and a conviction will be affirmed, in the absence of prejudicial error, if the properly admitted evidence, viewed and construed most favorably to the State, is sufficient to support the conviction. *State v. Jacob, supra*; *State v. Becerra*, 253 Neb. 653, 573 N.W.2d 397 (1998).

Murder in the first degree is defined as "kill[ing] another person . . . purposely and with deliberate and premeditated malice . . . ." § 28-303. Premeditation means to have formed a design to commit an act before it is done. See, Neb. Rev. Stat. § 28-302(3) (Reissue 1995); *State v. Drinkwalter*, 242 Neb. 40, 493 N.W.2d 319 (1992). A person kills with "premeditated malice" if before the act causing the death occurs, he or she has formed the intent or determined to kill the victim without legal justification. *State v. Drinkwalter, supra*. No particular length of time for premeditation is required, provided that the intent to kill is formed before the act is committed and not simultaneously with the act that caused the death. *Id.* The time needed for premeditation may be so short as to be instantaneous; the intent to kill may be formed at any moment before the homicide is committed. *Id.*

When viewing the evidence most favorably to the State, we determine there was more than sufficient evidence of premeditation for the jury to convict Larsen of first degree murder in the

death of Clinchers. The evidence revealed that before leaving the party to go find Clinchers, Larsen had stated to others that he wanted to "go finish [Clinchers] off." Moreover, there was evidence that Larsen inflicted the stab wounds in a series of two attacks on Clinchers. Larsen began stabbing Clinchers and then ducked out of sight when a car came through the alley. After the car passed, Clinchers made some noise, causing Larsen to note that Clinchers was not dead yet and to stab him again. Accordingly, there is sufficient evidence to support the jury's finding that Larsen killed Clinchers with premeditated malice, and we will not disturb the finding on appeal.

In addition, there was sufficient evidence that Larsen aided and abetted Arnold in the murder of Nelson. Nebraska's aider and abettor statute, Neb. Rev. Stat. § 28-206 (Reissue 1995), provides that a person who aids, abets, procures, or causes another to commit any offense may be prosecuted and punished as if he or she were the principal offender. *State v. Mantich*, 249 Neb. 311, 543 N.W.2d 181 (1996). Aiding and abetting requires some participation in a criminal act which must be evidenced by some word, act, or deed, and mere encouragement or assistance is sufficient to make one an aider or abettor; however, no particular acts are necessary, nor is it necessary that the defendant take physical part in the commission of the crime or that there was an express agreement to commit the crime. *State v. Arnold*, 253 Neb. 789, 572 N.W.2d 74 (1998); *State v. Mantich, supra.* But evidence of mere presence, acquiescence, or silence is not enough to sustain the State's burden of proving a defendant guilty under an aiding and abetting theory. *State v. Arnold, supra*; *State v. Trackwell*, 235 Neb. 845, 458 N.W.2d 181 (1990).

In the instant case, there was evidence that before entering Nelson's apartment, Arnold and Larsen had a conversation regarding who was going to actually kill Nelson, suggesting that Larsen was at least responsible for encouraging the commission of a crime. However, there was also evidence that Arnold used the same knife that Larsen had previously used in stabbing Clinchers to pry open a window to Nelson's apartment, which suggests that Larsen had at some earlier point in time provided Arnold with the knife. Furthermore, there was evi-

dence that Larsen committed the act of unlawfully breaking and entering into Nelson's apartment for the purpose of killing Nelson. Finally, there was evidence that Larsen hit someone in Nelson's apartment with a 2 by 4 piece of wood. This evidence is more than sufficient to support the jury's finding that Larsen aided and abetted Arnold in the murder of Nelson. Therefore, Larsen's final assignment of error is wholly without merit.

## CONCLUSION

For the foregoing reasons, we conclude that all of Larsen's assigned errors are without merit, and thus, we affirm the judgment of the district court.

AFFIRMED.